**CITY OF ST. LOUIS, Plaintiff,**

**Planned Industrial Expansion Authority of the City of St. Louis, Plaintiff/Appellant/Cross–Respondent,**

**v.**

**RIVERSIDE WASTE MANAGEMENT, L.L.C., Defendant/Respondent/ Cross–Appellant.[1]**

**No. ED 78691.**

Missouri Court of Appeals, Eastern District, Division Four.

March 19, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 25, 2002.

---

**1.** Although Riverside filed a cross-appeal, it did not assert any points of error on appeal and its cross-appeal must therefore be deemed abandoned. Rule 84.13.

Omri E. Praiss, Mark G. Arnold, Harry B. Wilson, St. Louis, MO, for appellant.

Ryan S. Shaughnessy, St. Louis, MO, for respondent.

LAWRENCE G. CRAHAN, Judge.

Plaintiff, the Planned Industrial Expansion Authority of the City of St. Louis ("PIEA") appeals the judgment in favor of defendant Riverside Waste Management, L.L.C. ("Riverside") on its counterclaim for breach of contract. We affirm in part and reverse and remand in part.

■ In this bench-tried case, our standard of review is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo.1976). We must sustain the judgment of the trial court "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Id.* at 32. In applying this standard, we review the evidence in the light most favorable to the judgment. *Gesellschaft Fur Geratebau v. GFG America Gas Detection*, 967 S.W.2d 144, 146 (Mo.App.1998).

PIEA is a public entity created by and existing under the authority of the Planned Industrial Expansion Law of Missouri, section 100.200 *et seq.* RSMo 1994. PIEA is the owner of a 45 acre parcel of land running along Hall Street in the City of St. Louis ("City") which is commonly known as the Hall Street Landfill ("Landfill"). The Landfill is located across the street from a City park in a residential neighborhood.

Since 1981, the City has held a permit issued by the Missouri Department of Natural Resources ("MDNR") to operate the Landfill as a "demolition landfill."[2] The permit includes specifications governing the size, height, width and other contours of the Landfill. At all relevant times, the

City was the only holder of an MDNR permit to operate the Landfill. Until May 1996, the Street Division of the City ("Streets") managed the operation of the Landfill.

In March and April of 1996, in order to settle a lawsuit over a different landfill filed by Riverside's parent company against PIEA and various other entities, PIEA and Riverside negotiated an agreement whereby Riverside would take over management of the Landfill. During this process, Riverside was allowed to inspect the Landfill with its engineers. When James Suelmann, the Director of Streets, learned of the proposed change in management of the Landfill, he protested vigorously to various City officials, to no avail.

On April 16, 1996, PIEA, as owner of the property, and Riverside entered into an "Agreement for Landfill Management Services" ("Agreement"). The City was not a party to the Agreement and no one executed it on behalf of the City.

Pursuant to the Agreement, PIEA engaged the services of Riverside to operate the Landfill for a period of five years unless the Agreement was earlier terminated. The Agreement required Riverside to operate the Landfill as a public landfill for purposes of disposal of construction and demolition waste materials in strict compliance with and as formally approved by MDNR. Riverside's operation and management of the Landfill was expressly subject to the rights of the City to utilize the Landfill on a "first priority basis" and free of charge for the deposit of light posts and standards, concrete, wood, asphalt and like debris generated from the operation of the City's Street Department. Riverside's

**2.** Section 260.200(8) defines a "demolition landfill" as a "solid waste disposal area used for the controlled deposit of demolition wastes, construction materials, brush, wood wastes, soil rock, concrete and inert solids insoluble in water." The primary differences between a demolition landfill and a sanitary landfill are in the type of waste permitted and how frequently it must be covered.

compensation was to be derived from fees charged to users other than the City. Specifically, the agreement provided:

> [Riverside] may permit use of excess capacity of the Landfill for a fee to users other than the City with the written permission of the Street Department, for the purpose of creating and enhancing a stream of revenue from fees for public disposal ... [Riverside] and Street Department shall meet bi-annually to determine the percentage of Landfill use (if any) required by the City of St. Louis, and the amount of excess capacity, if any, to be made available to the general public.

Under the terms of the Agreement, Riverside was to retain ninety-five percent of any revenue and five percent was to be remitted to PIEA.

At the time the parties entered into the contract the Landfill was not in full compliance with MDNR regulations. Specifically, Streets had not filed a landfill survey performed by the City Engineering Department in 1995 and erosion ditches on the eastern and southern side needed to be filled in. Also, Streets was late submitting properly completed tonnage fee reports and payments. The trial court found that the results of the 1995 Landfill survey were known to the City and PIEA at the time the contract between PIEA and Riverside was executed. The Landfill survey showed that a small portion of the Landfill was approximately two feet above the vertical limit specified in the permit.

The trial court found that PIEA and Riverside contemplated that the City would either transfer its permit to Riverside or the City would otherwise cooperate in allowing Riverside to manage the Landfill under the City's permit. Riverside approached MDNR concerning this subject and its Director confirmed by letter that Riverside could operate the Landfill as a subcontractor of the City. Inasmuch as the City was not a party to the contract and because PIEA entered into the arrangement over his objections, Mr. Suelmann was unwilling to allow Riverside to function as the City's subcontractor. Nevertheless, this is apparently how the arrangement was viewed by MDNR, inasmuch as Riverside was allowed to operate the Landfill without obtaining its own permit.

Riverside began to manage the Landfill in May 1996. Shortly thereafter, Mr. Suelmann wrote to MDNR advising of the change in management of the Landfill and requesting MDNR to direct all future correspondence concerning the Landfill to Riverside. In June 1996 Mr. Suelmann received a notice of violation from MDNR for failure to submit a quarterly tonnage report. Mr. Suelmann responded by forwarding a copy of his earlier letter requesting MDNR to direct all correspondence to Riverside. In August 1996, MDNR wrote to Mr. Suelmann advising him that the City remained responsible for the operation of the Landfill and for all reports required by the statutes and regulations so long as it held the permit.

In September 1996, Mr. Suelmann responded to MDNR's letter expressing confusion as to why the City was still listed by MDNR as the permittee for the Landfill. According to Mr. Suelmann, his May 1996 letter notifying MDNR that the Landfill would henceforth be operated by Riverside was intended as a surrender of the City's permit. After further discussions with the MDNR staff, however, Mr. Suelmann learned the process of surrender was not so simple. Specifically, Mr. Suelmann learned that upon surrender of the permit, the Landfill would be required to immediately cease accepting any waste and City would be required to complete closure activities within 180 days, at substantial ex-

pense. Upon learning of these requirements, Mr. Suelmann requested and MDNR granted additional time to consider alternatives to surrendering the permit. On November 15, 1996, however, MDNR notified Mr. Suelmann that it needed a written decision within two weeks or it would treat the latest letter as a surrender of the permit, thereby triggering the attendant consequences discussed above.

Although MDNR continued to view the City as the responsible party, Mr. Suelmann's attitude and actions throughout the period of Riverside's operation of the Landfill can hardly be characterized as responsible. For example, although he knew that a small portion of the Landfill exceeded the vertical limit specified in the permit at the time Riverside took over, Mr. Suelmann took no action to either correct the problem or see to it that Riverside did. Indeed, Mr. Suelmann continued to allow Street Department trucks, at Riverside's direction, to deposit waste in areas that were already substantially above the vertical limit specified in the permit. This occurred despite the fact that violation of the vertical limit could render the City of St. Louis liable for substantial fines and penalties.

Riverside never operated the Landfill within the height limitations specified in the City's permit. Instead, Riverside proposed to seek an expansion of the vertical limit, and thus the overall capacity, from MDNR. Indeed, Riverside submitted a proposal to MDNR even before it began operating the Landfill but it was returned because it did not reflect the concurrence of the City as the current permit holder. Confident that MDNR would eventually approve vertical expansion, Riverside simply ignored the current limits and substantially exceeded them. In effect, Riverside's strategy was to present MDNR with

a *fait accompli*, obtaining approval after the fact.

In response to MDNR's ultimatum, an associate city counselor wrote to the Executive Director of the St. Louis Development Corporation ("SLDC"), which effectively controls PIEA, advising that the City could not continue to accept responsibility for a permit for a Landfill on property owned by PIEA and operated by PIEA's lessee. The letter stated that the City would either effectuate a transfer of the permit by December 16, 1996, or the permit would be surrendered. The decision as to which course of action the City would take was left to PIEA.

On December 13, 1996, the Executive Director responded that SLDC "would not be opposed to the transfer of the permit" and requested that the "City take appropriate steps to facilitate a transfer." The Executive Director further advised that it would like to explore the possibility of transferring the permit to PIEA as owner if permitted by state law. City was asked to assist in such determination. If the permit could not feasibly be transferred to PIEA, SLDC "would not oppose transfer to the operator." On December 16, 1996, Mr. Suelmann forwarded a copy of the letter from SLDC to MDNR and expressed the City's intent to transfer the permit. A meeting was requested to discuss details.

Contrary to his representation to MDNR that the City intended to transfer the permit, Mr. Suelmann did nothing to effectuate a transfer. At trial, Mr. Suelmann testified as follows:

Q. All right, now you have your marching orders from PIEA. Did you transfer the permit to Riverside at that point?

A. I don't work for PIEA. I didn't get any marching orders. No, I did not.

Q. Well, you told them—you and the City counselor's office told them three days earlier that the decision was theirs, correct?

A. We told them to transfer the permit or we would surrender our permit. We did not tell them to send us a letter back to say transfer the permit.

Q. Okay, so it's your understanding that PIEA is the one responsible for actually transferring the permit, it's not your responsibility?

A. It's not my responsibility, and I'm not saying it's PIEA's responsibility. I don't care who transferred the permit.

Q. Who owns the permit?

A. I did.

Q. Did you ever tell PIEA that it's their responsibility to transfer your permit?

A. No, I think the letter clearly states that either transfer the permit or we will surrender it.

Q. Well, PIEA told you then to transfer the permit.

A. That's right, they did.

Q. Did you do that?

A. No, I didn't. I don't work for PIEA.

Q. Well, you told PIEA in a letter three days earlier that it was their decision whether or not to transfer the permit or to let us surrender it.

A. Correct.

Q. And PIEA says transfer it. Did you do what they told you to do?

A. I don't work for PIEA. I did not do what they told me to do.

So far as can be determined from the record, Mr. Suelmann did not share his private interpretation of City's position with anyone. Nor, apparently, was it clear to either PIEA or Riverside that Mr. Suelmann had no intention of so much as lifting a finger to effectuate a transfer of the permit.

In December 1996, the City received a notice of violation from MDNR including a finding that the Landfill had exceeded the vertical boundary specified in City's permit. Additional notices of violation of the vertical limit were received in February and May 1997. Copies of these notices were sent by the City to PIEA and Riverside.

On January 31, 1997, Riverside's engineering consultant wrote to the Regional Director of MDNR in response to the December 1996 notice of violation. He acknowledged that the vertical boundary had been exceeded and indicated that Riverside was in the process of preparing plans for a vertical expansion. On February 10, 1997, MDNR, PIEA, Riverside and Streets met to discuss transfer of the permit and future operation of the Landfill. Who would apply for transfer of the permit was still an open question, although the experts appear to agree that this could not be accomplished without the City's active participation as the current permit holder. In the meantime, Riverside continued to accept waste materials from Streets and from the public.

As a follow up to the February 10th meeting, Riverside's engineering consultant wrote to MDNR acknowledging that the Landfill exceeded the currently approved vertical height by up to 10 feet in the southeast corner. The consultant noted that a small amount of unused, permitted capacity remained in the south central and northeast portion of the landfill. According to the consultant, Riverside planned to move its operations to these areas.

On March 6, 1997, Riverside's attorney wrote to PIEA's attorney noting that

MDNR had recently given Mr. Suelmann a deadline of March 31, 1997 to give notice of the City's intentions with regard to transfer or surrender of the permit for the Landfill. The letter advised that Riverside had been pursuing quotes from insurance companies for a bond to serve as its financial assurance instrument, which would be required if Riverside obtained the permit. Riverside's attorney noted, however, that the quote it had obtained assumed a 7 year life for the Landfill, which could potentially be further expanded if MDNR agreed to vertical expansion as favored by Riverside. Such an expansion could affect the financial terms of the proposed bond.

On April 14, 1997, Riverside's engineering consultant forwarded to Riverside a draft setting forth the steps necessary for the transfer of City's permit to PIEA and Riverside. Significantly, two of the background assumptions set forth by the consultant were that the City would remain the current permit holder until the transfer was approved by MDNR and that the City would submit an application for a "small" vertical expansion of the Landfill to bring the Landfill into compliance and to add an additional 12 months of capacity. Among the steps required for transfer of the permit was submission of a letter, signed by the City of St. Louis as current permit holder, requesting transfer of the permit to PIEA and Riverside. In the meantime, Riverside continued to accept waste at the Landfill from Streets and from the public.

On April 29, 1997, PIEA's attorney faxed a letter to the Executive Director of the SLDC relating that he had received a telephone call from an inspector for MDNR who had just completed an inspection of the Landfill. The inspector indicated he would be issuing a new notice of violation for exceeding the vertical limit specified in the permit. According to the inspector, the Landfill was essentially full and areas cited in the December notice now had an additional 8 feet of fill added, all in violation of the vertical limit. In the meantime, Riverside continued to accept waste at the Landfill from Streets and from the public.

On May 12, 1997, Riverside's attorney wrote to Mr. Suelmann forwarding its consultant's recommendations concerning the steps necessary to effectuate transfer of the City's permit to PIEA and Riverside. Also enclosed was a proposed draft of a letter from Mr. Suelmann to MDNR supporting yet another enclosed draft proposal for vertical expansion of the Landfill. The letter notes that the Landfill had reached capacity and urged that the proposed vertical expansion was necessary to keep the Landfill operational until approval of the proposed permit transfer was obtained from MDNR. Mr. Suelmann never sent the proposed letter. In the meantime, Riverside continued to accept waste from Streets and from the public.

On May 15, 1997, PIEA's attorney wrote to MDNR advising that the City had agreed to request a transfer of the permit to PIEA and Riverside. The letter stated that it would be submitted with a proposed vertical expansion and that City would remain the permittee until the transfer was approved by MDNR. The letter expressed concern about the notices of violation issued by MDNR and said PIEA would take steps to ensure the items identified were remedied. The letter further stated that the proposed modifications of the permit would only be requested if the Landfill could be operated in full compliance with MDNR regulations and the terms of the Landfill permit. PIEA was said to be taking steps to ensure that Riverside immediately corrected all violations and im-

mediately cease any dumping on areas that exceeded the current vertical limit.

On the same date, PIEA's attorney also wrote to Riverside's attorney stating that PIEA was inclined to consent to Riverside's proposed vertical expansion, but only if Riverside demonstrated that it would manage the Landfill in conformance with the permit, MDNR regulations and the Agreement. The letter stated PIEA was disappointed with Riverside's performance to date and noted that three notices of violation had been issued by MDNR and that the deficiencies identified had not been corrected. The letter declared that Riverside was in default under the agreement for failure to operate the Landfill in compliance with the environmental laws. Specifically, PIEA pointed out that the eastern and southern slopes were not at the proper grade, Riverside was placing waste in areas above the vertical limit approved by MDNR and Riverside was not properly separating prohibited material before compacting. Riverside was given 30 days to cure the default. PIEA further advised that it was retaining a consultant to determine whether Riverside was in compliance with MDNR regulations and whether it had cured the default. The letter further cautioned that, although it was inclined to consent to a vertical expansion, it was not required to do so under the terms of the agreement and would not do so unless Riverside cured its default.

On May 19, 1997, Riverside's attorney responded to PIEA, protesting that PIEA's declaration of default was unjustified. Riverside maintained that the violations of the vertical limits could be cured by its proposed request for vertical expansion. Riverside further claimed that its proposed solutions to the slope and coverage issues were being stymied due to lack of concurrence by Streets. Riverside also advised PIEA that it was not interested in obtaining a permit unless the capacity of the Landfill was expanded to assure Riverside of another 8 to 10 years of useable life. Otherwise, the bond required for transfer of the permit would not be economically feasible.

On May 30, 1997, MDNR sent Mr. Suelmann a Final Demand Letter pointing out that the City still had not updated its financial assurance instrument, waste had been placed as much as 10 to 15 feet above the vertical limits in the east and west areas of the Landfill, tonnage fee reports were overdue, compost was being stored without MDNR approval and final cover had not been applied to completed areas of the Landfill. The notice demanded action correcting all violations except for the material above the vertical boundary within 30 days and submission of a plan to correct the vertical limit violations within 60 days. Otherwise, MDNR warned that it would pursue formal enforcement action.

On June 24, 1997, PIEA informed Riverside that it was closing the Landfill effective July 7, 1997. On June 25, 1997, Riverside's attorney wrote to PIEA's attorney informing him of the status of Riverside's attempts to address the items that caused PIEA to declare Riverside in default. Riverside had prepared a plan for a temporary expansion of the vertical height limits but was still awaiting consent of Streets. Compost material was to be removed by the City Parks department by July 1, 1997. Riverside reported that it had obtained permission from MDNR to use some of the compost material as interim cover on the exposed southern slope until it could be covered and seeded in the fall. A survey had been ordered to determine precisely which areas were above and below the vertical limit. MDNR had approved new procedures for separating prohibited waste. The letter again complained that its proposed solutions to the

problems were being held up by a lack of written concurrence by the City as the current permit holder. Riverside further advised that, in its view, only the City had the authority to close the Landfill and stated it intended to take the matter up with the City.

On June 30, 1997, PIEA's attorney responded reiterating that it expected Riverside to close the Landfill on July 7, 1997 until it could determine whether sufficient permitted capacity remained to continue disposal activities. PIEA pointed out that the areas filled in in violation of the existing permits were substantial and had increased significantly during Riverside's tenure as operator. PIEA felt it would be imprudent to continue to add waste to the Landfill even in areas that might be below the vertical limits until it could determine what to do about the areas above the vertical limits.

On July 19, 1997, Mr. Suelmann responded to MDNR's final demand letter relating that an updated Financial Assurance Instrument was ready to be signed and forwarded to MDNR, waste placed above the vertical limit was being surveyed, no new waste would be accepted until a solution was devised, and tonnage reports were being processed.

On December 5, 1997, MDNR forwarded an inspection report to Mr. Suelmann pointing out that a survey conducted in July 1997 established that the Landfill exceeded its approved elevation by approximately 16 feet on part of the east side and by approximately 8 feet on part of the west side. Further, there was partially exposed waste visible and final cover had not been applied to completed areas.

On March 3, 1998, PIEA's attorney forwarded yet another MDNR inspection report reflecting further violations of MDNR regulations. According to PIEA, its analysis indicated the Landfill taken as a whole exceeded its permitted capacity. Moreover, in PIEA's view MDNR's approval of any expansion was uncertain and Riverside's latest proposed expansion would not provide sufficient useful life to justify the expense of obtaining a bond. PIEA also asserted that Riverside had not made material efforts to correct the many deficiencies identified in the numerous MDNR inspection notices. Accordingly, PIEA declared the Agreement terminated as of April 3, 1998.

Notwithstanding PIEA's notice of termination, on March 18, 1998 Riverside re-entered the Landfill, cut the lock off the gate and resumed operations. Although Riverside claimed it was receiving loads of dirt required for cover, on April 6, 1998, representatives of the City observed and videotaped Riverside employees accepting debris, including types of debris not permitted in a demolition landfill.

Also on April 6, 1998, the City received notice from MDNR that it had commenced an enforcement action against the City for violations of the Missouri Solid Waste Management Law and regulations at the Landfill. MDNR indicated that a penalty of $409,203 had been calculated based on violations and continuing noncompliance for up to 349 days. However, MDNR also offered to settle the matter for a total penalty of $140,130.[3]

On April 8, 1998, City and PIEA filed the instant action seeking to enjoin Riverside from engaging in any further activities at the Landfill. A temporary restraining order was issued the same day and a temporary injunction was issued on June 1, 1998.

On July 29, 1998, the trial court granted Riverside's motion to stay proceedings

3.  This matter apparently remained unresolved    at the time of trial.

pending arbitration. However, after initiating an arbitration proceeding, the parties agreed to submit their dispute to the trial court. In May 1999, Riverside filed an amended answer and counterclaim against City and PIEA seeking declaratory and injunctive relief and damages for breach of contract. At trial, the parties presented testimony and exhibits in support of their respective claims. In addition, the parties offered testimony and exhibits produced in the canceled arbitration proceeding.

On Riverside's counterclaim, the trial court found that PIEA was not the City's agent in any transaction with Riverside and had no power or authority to bind the City in any manner. Inasmuch as the City was not a party to the contract between PIEA and Riverside, Riverside's claim against the City for breach of contract was without merit. Riverside has not briefed any error with respect to this finding and it is therefore affirmed.

The trial court further found that PIEA and Riverside knew at the time of execution of the contract that transfer or modification of the City's operating permit was essential to Riverside's performance and that PIEA therefore had an implied duty to assist Riverside in securing transfer or modification of the City's permit notwithstanding express language in the Agreement imposing on Riverside the burden of obtaining all necessary permits.[4] According to the trial court, PIEA acted unfairly and in bad faith by failing and refusing to assist Riverside in procuring transfer of the permit from the City to PIEA or Riverside or in procuring the cooperation of

the City in the surrender of its operating permit in conjunction with the application. Inasmuch as PIEA's then corporate counsel testified that PIEA did cooperate in Riverside's filing of its initial application for transfer of the permit and also filed its own application for a change, PIEA's alleged breach apparently lies in its failure to procure the City's written concurrence, which was MDNR's stated reason for rejecting the attempts to transfer the permit. Just what steps PIEA could or should have taken to force the City, a non-party to the Agreement, to file its written consent to the transfer are not identified in the judgment.

The trial court further found that, but for PIEA's breach in failing to do more to secure transfer of the City's permit, Riverside would have been able to obtain from MDNR authority to expand the capacity of the Landfill and extend its useful life by three additional years or to the end of the five-year term of the contract. At that point, according to the trial court, the Landfill would likely again be at capacity. Based on what the trial court acknowledged to be "somewhat sparse" evidence of Riverside's weekly gross profits during its operation of the Landfill, the trial court found that Riverside was entitled to an award of $1,900,000 in anticipated net profits.

The trial court further found that it was now unlikely that MDNR would permit any party to resume operation of the Landfill. Because the City, as the only holder of a permit for the Landfill, was therefore entitled to bar others from using

---

4. Although not essential to our analysis, we note that this finding is contradicted in part by other findings made by the trial court. Elsewhere in the judgment, the trial court found that PIEA and Riverside contemplated that the City would either transfer its permit to Riverside or would otherwise cooperate in allowing Riverside to manage the Landfill under its permit. Although City considered the latter arrangement unacceptable, the fact remains that MDNR never objected to Riverside's management of the Landfill without obtaining its own permit and Riverside was able to accept waste completely exhausting the permitted capacity of the Landfill without ever obtaining its own permit.

it, City's request for injunctive relief barring further operations at the Landfill was granted. PIEA now appeals the trial court's award of damages to Riverside.

On appeal, PIEA asserts that the trial court erred in awarding Riverside its anticipated lost profits under the agreement because the award is based on speculation in that there is no evidence that MDNR would have granted a vertical expansion modification necessary for Riverside to continue to operate the Landfill and Riverside failed to offer competent evidence to support the trial court's calculation of anticipated profits. PIEA further claims the trial court erred in failing to find that Riverside breached the agreement by failing to strictly comply with all applicable environmental laws as required by the Agreement and that the trial court's finding that Riverside's performance was in substantial compliance with the Agreement is contrary to the weight of the evidence. Finally, PIEA claims the trial court erred in finding that PIEA breached the agreement by failing to assist Riverside in obtaining transfer of the City's permit to Riverside. We find PIEA's first point to be dispositive.

Although our review of the judgment must necessarily be confined to the specific errors asserted by PIEA on appeal, we note that our review in this case is complicated somewhat by the fact that the judgment itself contains arguably contradictory factual findings and inherently rests on assumptions which are either contrary to the evidence, illogical, or contrary to the express terms of the Agreement. Given the somewhat bizarre structure of the Agreement, it is not at all surprising that the parties should find themselves in this court.

Under the Agreement, PIEA and Riverside contracted for Riverside to operate the Landfill for an initial term of five years. The only entity with a permit to operate the Landfill was the City, which was not a party to the agreement. Although the trial court found that PIEA breached the Agreement by failing to do more to secure transfer of the City's permit to PIEA and/or Riverside, this is something of a red herring. It is undisputed that Riverside was in fact allowed by MDNR to operate the Landfill as a *de facto* subcontractor of the City and that it managed to completely exhaust and exceed the permitted capacity of the Landfill without ever obtaining its own permit. This was of great financial benefit to Riverside because it meant that Riverside never had to incur the substantial cost of obtaining a bond to serve as its financial assurance instrument, which would have been a condition precedent to obtaining a permit of its own. Instead, throughout Riverside's operation of the Landfill, the City, not Riverside was viewed by MDNR as the party financially responsible for Riverside's compliance with the environmental laws. The City, however, had no contractual relationship with Riverside, and thus no means of assuring Riverside's compliance. Indeed, although the Agreement left to Streets, in consultation with Riverside, the determination of whether there was any excess capacity available for sale to the general public, so far as we can determine, Riverside simply ignored the requirement that it obtain the written permission of Streets.

It is clear, then, that the failure to secure transfer of the City's permit did not prevent Riverside from performing its obligations under its Agreement with PIEA at least insofar as they were defined by the permitted or authorized capacity of the Landfill at the time the Agreement was signed. Rather, the failure to obtain transfer of the City's permit prevented Riverside from applying for a modification to *expand* the capacity of the Landfill be-

yond what was specified in the City's permit.

■ In its first point, PIEA urges that the trial court erred in awarding Riverside its anticipated future profits under the Agreement because the existence of such future profits are based on sheer speculation that MDNR would have granted a modification to increase the capacity of the Landfill. We agree. PIEA points out that Riverside's president conceded at trial that Riverside did not dispute PIEA's consultant's determination that, as of the time of trial, there were 182,152 cubic yards more debris in the Landfill than were permitted under the City's permit. Therefore, assuming for the sake of argument that the permit had been transferred to Riverside and Riverside applied for an expansion of the capacity of the Landfill, Riverside could not suffer any loss of anticipated profits unless MDNR would have approved such proposed expansion. As PIEA further points out, however, whether MDNR would have approved a request to expand the capacity of the Landfill is sheer speculation. The trial court correctly recognized this when Riverside attempted to have its witnesses render an opinion as to the likelihood that MDNR would approve a request to expand the vertical limit:

Q. And, in fact, did you expect that your first step stone plan, this very moderate expansion that would give you another approximately half million cubic feet of air space, did you expect that that would have any problem, based on your experience at MDNR?

Mr. Wilson: Objection, speculation and no foundation.

* * *

The Court: I agree with Mr. Wilson, it's speculation about what MDNR would do if an application had been made.

* * *

Q. Give us your opinion Mr. Gredell, as to whether or not a proposed modification, especially one of the conservative nature that you have produced and sent in, would be approved for a vertical expansion.

Mr. Wilson: Same objection, speculation, form.

The Court: Again, Mr. Goldstein, I'm not going to let you, let him give an opinion whether it would be approved or not.

Testimony from James Hull, the Director of the Solid Waste Management Program at MDNR confirmed that the mere fact that a party might request a modification was no assurance that it would be granted. As Mr. Hull put it, "anybody can request anything, almost. They can send in an application to us for whatever. It does not necessarily mean we are going to approve it."

■ It is well established that competent and substantial evidence is required to support an award of damages. *Carmel Energy, Inc. v. Fritter,* 827 S.W.2d 780, 783 (Mo.App.1992). Missouri law regarding lost profits has delineated a distinction between evidence establishing the fact of damage and evidence establishing the amount of damage. It is the fact of damage which must be proven with reasonable certainty. *Whitman's Candies, Inc. v. Pet, Inc.,* 974 S.W.2d 519, 526–26 (Mo.App. 1998).

In this case, the trial court correctly recognized in its evidentiary rulings that whether MDNR would have approved an application to expand the capacity of the Landfill, and thus whether Riverside would have earned any future profits, was

entirely speculative. Yet in its judgment, the trial court inexplicably predicated its award of damages on a finding that, but for PIEA's breach "Riverside would have been able to expand the capacity of the Landfill and extend its useful life by a minimum of three additional years," (which was the remaining life of the Agreement). The trial court was no more entitled to engage in such speculation than the witnesses were.

We agree with PIEA that *Total Economic Athletic Management of America Inc. v. Pickens*, 898 S.W.2d 98 (Mo.App. 1995), is directly on point. Pickens was a professional football player who hired the plaintiff to negotiate his contract in return for a percentage of Pickens' total compensation. Pickens fired the plaintiff and hired a different agent who negotiated a series of five one-year contracts, each of which required that Pickens make the team to qualify for compensation. The case was tried during the third year and the plaintiff presented evidence that Pickens had made the team in each of the first two years and would make the team in the third year as well. The plaintiff further argued that the team believed Pickens would make the team in the next two years and that there was no evidence to the contrary. The trial court, however, refused to allow any argument as to what Pickens might have done in the fourth and fifth years. On appeal, this ruling was affirmed because Pickens compensation in the fourth and fifth years was dependent upon future contingencies, *i.e.*, making the team, and the occurrence of such contingencies was uncertain and speculative.[5]

The same is true in this case. Riverside failed to establish with reasonable certainty the occurrence of the essential future contingency that MDNR would grant a vertical expansion of the Landfill, without which Riverside would have had no authority to continue to operate the Landfill. Absent such evidence, Riverside's ability to continue operating the Landfill was uncertain and speculative, thus precluding an award of anticipated lost profits.

In defense of the judgment, Riverside directs our attention to testimony by its expert elicited in the arbitration proceeding that was discontinued by agreement of the parties. Over PIEA's objection, the arbitrator permitted the expert to give his opinion as to whether an application for a vertical expansion would have been approved. Although this evidence was submitted to the trial court, so was PIEA's objection, which should have been sustained consistent with the trial court's other rulings. In a court-tried case, we generally assume that the trial court disregards inadmissible evidence. *Mullenix St. Charles Properties, L.P. v. City of St. Charles*, 983 S.W.2d 550, 557 (Mo.App.1998).

On the evidence adduced, what MDNR, a regulatory body with discretion to approve or disapprove an application, might do under the circumstances presented was inherently speculative. It was not a proper subject of expert testimony and to the extent such testimony was before the court, it was not competent and substantial evidence which will support an award for future lost profits.

The cases relied upon by Riverside are clearly distinguishable. In *Mason–Rust v. Laborers' International Union of North America*, 435 F.2d 939 (8th Cir.1970) the court pointed out that there was no uncertainty as to the fact of damage, only the

**5.** We reject Riverside's contention that this holding is dicta. *Holt v. State*, 494 S.W.2d 657, 659 (Mo.App.1973) (when a court bases its decision on two or more distinct grounds, each is as authoritative as the other and neither is obiter dictum).

amount thereof. *Id.* at 945–46. In this case what is uncertain is the fact of damage in that Riverside would not have been able to earn any future profits unless a third party, MDNR, approved a significant expansion of capacity. Likewise, in *Joe Garavelli's Restaurant v. Colonial Square Associates,* 21 S.W.3d 149 (Mo.App.2000) although the landlord argued it was speculative whether the restaurant would continue to be profitable in the future, the award of future profits was supported by expert testimony and was not dependent on contingent future action by a regulatory agency. *Id.* at 152–53. A third case, the Western District decision in *Farmer's Electric Cooperative, Inc. v. Missouri Department of Corrections,* 2001 WL 212917, 2001 Mo.App. LEXIS 357 (March 6, 2001) is not precedent for anything because the case was later transferred to the Missouri Supreme Court. *Farmers' Electric Cooperative, Inc. v. Missouri Department of Corrections,* 59 S.W.3d 520 (Mo.2001). If anything, the decision of the Missouri Supreme Court supports PIEA because the court held that claims for damages extending beyond the life of the contract were too speculative to be recoverable.

In the present case, although the trial court only awarded damages for the three years remaining on the Agreement, such award is speculative for the reasons set forth above and is also contrary to the language of the Agreement and PIEA's own statements as to its intentions. The plain language of the Agreement provided no assurance that there would be any excess capacity for Riverside to sell for the life of the Agreement. Rather, under the express terms of the Agreement, Riverside was permitted to allow the general public to use excess capacity of the Landfill for a

fee "with the written permission of the Street Department," which was to determine bi-annually with Riverside "the amount of excess capacity, *if any,* to be made available to the public." (emphasis added).[6] We find nothing in this language or in any other provision of the agreement which would have required PIEA to agree to any expansion of capacity beyond that permitted under the City's permit at the time the Agreement was signed.

Even assuming for the sake of argument that PIEA had an obligation to consent to an expansion sufficient to allow Riverside to sell excess capacity for an additional three years, it clearly had no obligation to consent to an expansion that would extend beyond the initial term of the Agreement. Yet Riverside consistently represented to PIEA that it was not interested in pursuing a transfer of the permit unless it could obtain MDNR approval for an expansion of capacity that would permit it to operate the Landfill for a minimum of seven to eight additional years. According to Riverside, this was the minimum period necessary to amortize the substantial expense Riverside would incur to obtain a bond to serve as its financial assurance instrument. Thus the trial court's determination that it was technically feasible to obtain MDNR approval for a three-year expansion fails to take into account that Riverside's own position that it would not pursue transfer for an expansion of such a limited duration.

Riverside's defense of the trial court's judgment likewise fails to take into account the fact that MDNR was fully aware that Riverside was responsible for the vast majority of the encroachments that had occurred under the existing City permit. Although MDNR was pursuing its enforcement action solely against the City, it was

---

6. Insofar as we can determine from the record, Riverside simply ignored these express constraints upon its ability to sell excess capacity, which it conceded at trial was now exhausted.

abundantly clear that Riverside had simply ignored the height limitations specified in the permit and had continued to pile debris on top of areas that had already been cited as violating the height restrictions. To suggest that MDNR would approve a request for an additional expansion under such circumstances is purely conjecture.

For the foregoing reasons, we hold that the trial court's award of damages to Riverside in the form of future lost profits is speculative and unsupported by substantial evidence. In view of this determination, we find it unnecessary to address PIEA's remaining claims of error. The judgment in favor of Riverside and against PIEA is reversed and remanded for further proceeding. In all other respects, the judgment is affirmed.

SHERRI B. SULLIVAN, P.J., concurs.

LAWRENCE E. MOONEY, J., concurs.