ADOLPHO A. BIRCH, JR., J., concurring in part and dissenting in part.

I concur in the conclusion of the majority that Rollins' convictions should be affirmed. As to the sentence of death, however, I respectfully dissent. I continue to adhere to my view that the comparative proportionality review protocol currently embraced by the majority is inadequate to shield defendants from the arbitrary and disproportionate imposition of the death penalty. See *State v. Reid,* 164 S.W.3d 286, 323–325 (Tenn.2005)(Birch, J., concurring and dissenting), and cases cited therein. Accordingly, I respectfully dissent from that portion of the majority opinion affirming the imposition of the death penalty in this case.

**Henry DENNIS**

v.

**ERIN TRUCKWAYS, LTD., et al.**

Supreme Court of Tennessee,
at Nashville.

Feb. 1, 2006 Session.

April 17, 2006.

Nicholas S. Akins and Bree A. Taylor, Nashville, Tennessee, for the Appellants, Erin Truckways, Ltd., a/k/a Erin Truckways, Ltd., Inc., a/k/a Digby Truck Lines, and Georgia Insurers Insolvency Pool.

Russell D. Hedges, Tullahoma, Tennessee, for the Appellee, Henry Dennis.

## OPINION

E. RILEY ANDERSON, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and, and ADOLPHO A. BIRCH, JR., JANICE M. HOLDER, and CORNELIA A. CLARK, JJ., joined.

We accepted review of this workers' compensation case to determine whether the trial court erred in setting aside the parties' mediated settlement agreement. We hold that it did not. We also hold that the trial court did not err in determining that the employee is totally and permanently disabled and that it did not err in calculating the employee's permanent total disability benefits. Finally, we hold that the Workers' Compensation Law does require the employer to modify existing housing to make it wheelchair-accessible for the employee if medically necessary. We remand for a determination of that amount.

### Background

The record contains the following facts. On November 7, 1997, the plaintiff, Henry Dennis ("Dennis"), was injured in the course and scope of his employment with the defendant, Erin Truckways Limited, Inc., a/k/a Digby Truck Lines ("Erin Truckways" or "employer"). Dennis was thrown from a truck when the driver lost control of the truck and ran off the road. He sustained severe injuries including paralysis from the waist down and a crushed upper gum. Dennis was twenty-nine years old at the time of the accident.

At trial on November 29, 2004, Dennis testified that he dropped out of school in the ninth grade, was not married at the time of trial, and had seven children. His only vocational training was a nine-week-end truck driving program. Dennis completed the course and earned a commercial driver's license. His work experience was all in the area of truck driving and manual labor. He went to work for Erin Truckways on August 15, 1997, just twelve weeks before the accident.

Dennis reached maximum medical improvement on November 23, 1998. His treating physician, Dr. Apple of the Shepherd Center in Atlanta, Georgia, assigned a permanent anatomical impairment rating of 75% to the body as a whole. Since the accident, Dennis has lived in his mother's house in Atlanta, Georgia with his mother, his brother, his son, and his mother's boyfriend. He pays his mother $300 per month in rent and board.

The home is not wheelchair-accessible. There are steps at both the front and back entrances, so Dennis requires assistance to enter or leave the house. Because the bathroom door is not wide enough to accommodate his wheelchair, and there is not room in the bathroom to accommodate a wheelchair-accessible shower or toilet, Dennis cannot bathe or use the toilet without assistance. Dennis explained that although he can fit his wheelchair into the kitchen, the kitchen is not big enough to allow him to "maneuver around" once he gets there, so he is not able to prepare his own meals. Due to his paralysis, Dennis must engage in a two-hour "bowel program" each day to evacuate his bowels. Because he cannot get into the bathroom, and because the toilet cannot accommodate a special seat to allow him to use it, he must perform the bowel program lying in bed on his side. He requires assistance every day to perform this function. For all of these reasons, Dennis requires daily nursing care.

Following the accident, Erin Truckways paid Dennis' sizable medical bills, and Dennis did not retain an attorney to represent him in the immediate aftermath of the accident. Dennis testified, however, that at some point following the accident he

was having trouble getting his dental bills paid. At that point he hired an attorney, Bob Lype, to seek payment by the employer. Lype also filed a complaint for workers' compensation benefits on Dennis' behalf in August 1999, but eventually referred him to another attorney, Bart Solomon, to handle the workers' compensation case. Dennis testified that he discharged Solomon three months before settling his case, however, because the insurance adjuster, Barbara Jones ("Jones"), told him "several times" that he was only eligible for 400 weeks of benefits. He stated that the adjuster advised him not to use an attorney because if he did, the attorney would get 25% of the 400 weeks of benefits. He said that he listened to the adjuster "because I thought she was my friend." He testified that he understood that he was permanently and totally disabled, but believed that he could not get more than 400 weeks of benefits.

Dennis testified that he attended a Benefit Review Conference ("BRC") on July 11, 2000, in Chattanooga, Tennessee. He was not represented by counsel at the BRC. Dennis stated that there were three people present at the BRC: himself, the adjuster Jones, and Kay Byas ("Byas"), the mediator from the Department of Labor ("DOL"). Dennis testified that at the outset of the mediation, Jones told Byas that the employer wanted to offer Dennis 400 weeks of benefits and that he "went along with it." He testified that Byas, the mediator, never told him that it was possible for him to get more than 400 weeks of benefits. He also testified that he never asked if it were possible for him to get more than 400 weeks of benefits.

The settlement agreement stated that Dennis' average weekly wage as of the date of the accident was $581.06, entitling him to the statutory maximum rate of $387.39. The agreement stated that "Un-der Tenn.Code Ann. § 50–6–207(3), employee is entitled to benefits for permanent *partial* disability of $387.39 per week for 400 weeks, in the total amount of $154,956.00." (Emphasis added.) The agreement then recited that Dennis had already been advanced $32,919.09 and that "the parties have resolved all issues remaining on the claim for $123,000.00." The remaining settlement was paid in a lump sum of $79,000, less $2,575.78 for child support arrears, plus $44,000, which was invested in an annuity. Dennis receives $300.36 per month from the life-term annuity, from which $150 is deducted for child support. The agreement also provided for future medical expenses and provided Dennis $25,000 to purchase an accessible vehicle.

In addition to the amount and terms of compensation, the settlement agreement also stated the following provisions pertinent to our analysis. First, the agreement stated that

> the undersigned Workers' Compensation Specialist for the Tennessee Department of Labor has mediated this matter, and has determined this proposed settlement provides the Employee, substantially, the benefits provided by the Tennessee Workers' Compensation Law; or in the case of a disputed claim. That (sic) the compromise reached is in the best interest of the Employee.

Second, the settlement stated the following:

> **MAXIMUM AWARD LIMITATION.** Employee has **not** returned to the pre-injury employment at a wage equal to or greater than the wage Employee was receiving at the time of injury. Accordingly, the **maximum** permanent partial disability award the Employee may receive is six (6) times the medical impair-

ment rating under Tenn.Code Ann. § 50–6–241 (1992).

(Emphases as in original.)

Although Byas mediated the BRC, she did not sign the settlement agreement. The agreement was approved by "Bill Gaines for Kay Byas." Bill Gaines ("Gaines") was another Workers' Compensation Specialist senior to Byas. The agreement was not approved by a court.

Dennis testified that after the settlement conference he received a telephone call from Gaines informing him that Gaines was approving the settlement agreement. Dennis testified that Gaines did not discuss with him the pros or cons of going to court. He further testified that no one at the DOL ever explained the availability of lifetime benefits to him and that he never appeared before a judge.

Dennis testified that he receives $749 per month in Social Security disability benefits and that, combined with the $150 he receives each month from the annuity, his monthly income is $899.

Since the settlement, Dennis has had three skin flap surgeries (similar to but more serious than a skin graft) on his hips and buttocks due to the weakness of his skin there and the stress on his skin of sitting up for several hours a day. Each surgery has required a two-month hospital stay. Since the third surgery, he is limited to sitting no more than eight hours per day, in four-hour stretches. Dennis said that he usually sits up less than this because he is afraid of damaging his skin and having to endure another painful surgery.

In addition to the skin flap surgeries, in July 2000 Dennis also had surgery on his back to remove the clamps and rods that had been implanted along his spinal cord following his 1997 injury. He testified that he has had constant back pain since the end of 2001. He also continues to have problems with his teeth and gums. Following the accident Dennis received a bone transplant to rebuild his crushed top gum. He testified that the screws securing the implant protrude through his gum and cause him pain, often severe enough that he cannot eat. He takes medication daily for pain in his back, shoulder and mouth; suffers from depression; takes medication to sleep; and continues to require daily nursing care.

## Medical Evidence

Ginger Ewing ("Ewing") testified that she is a licensed practical nurse and has been in practice for almost nineteen years. She operates a company providing home health care for paraplegics and quadriplegics and is Dennis' home health care nurse. She testified that as of the time of trial she had cared for him on a daily basis for almost four years. Each home visit lasts for approximately forty-five minutes to an hour, during which time Ewing assists Dennis with caring for himself and monitors his health in cooperation with Dennis' treating physician. She testified that Dennis had had problems with his skin breaking down, with back and shoulder pain, with weight loss, and with depression.

Dr. Arthur Simon testified by deposition that he is the outpatient director of the plastic surgery clinic at the Shepherd Center, where Dennis receives care. He stated that the Shepherd Center is a catastrophic-care hospital providing care to patients with spinal cord injuries. Dr. Simon testified that, although "I shouldn't give up hope," Dennis was permanently disabled from his injury. Dr. Simon explained that persons with spinal-cord injuries often experience pressure sores from being unable to move for long periods of time. He testified that Dennis had experienced three different pressure sores requiring surgery. Each of the sores was

"grade four," meaning that they went down to the bone.

Dr. Simon stated that in his opinion, Dennis was prone to the sores because "he does not reside in a[sic] handicapped-accessible housing." Dr. Simon explained that because Dennis often has to drag himself into spaces where his wheelchair does not fit, he is prone to damaging his already fragile skin. Moreover, because Dennis does not have an accessible bathroom, he must empty his bowels while lying on his side in bed. Dr. Simon stated that patients like Dennis often have cross-contamination from feces or urine into the bedsores, creating an infection, explaining that "problems [that] are innocuous to an able body become a surgical situation to someone who is spinal-cord injured."

Dr. Simon stated that in his opinion, wheelchair-accessible housing was medically necessary for Dennis. He further testified that in his opinion, wheelchair-accessible housing was also necessary to Dennis' mental health, because Dennis is "a prisoner" in his mother's house, and he does not have access to perform the functions that are "necessary to his essence of being a human being." Dr. Simon also stated that in his opinion, if Dennis were in appropriate housing, he would eventually no longer need daily skilled nursing visits.

### Housing Evidence

Eddie Noel Hartley ("Hartley") testified at trial on behalf of Dennis. He testified that he is a rehabilitation contractor, which means that he is a contractor specializing in constructing wheelchair-accessible buildings for persons with disabilities. Hartley testified that he visited Dennis' mother's house to evaluate what would be necessary to modify the home so that it would be accessible to Dennis. He concluded that although Dennis has the necessary upper-arm strength to transfer and move himself about in an accessible environment, it would not be possible to modify Dennis' mother's home to make it wheelchair-accessible.

Gregory E. Garner ("Garner") testified at trial on behalf of Erin Truckways. Garner testified that he was a contractor specializing in accessibility design. Garner agreed with Hartley that Dennis' mother's house was not capable of being modified to make it wheelchair-accessible. Garner testified that he had located two apartment complexes in the area where Dennis wished to live that had wheelchair-accessible units. He also identified several others that could be modified to be wheelchair-accessible. He testified that the rents ranged from $619 per month to $799 per month. He testified that there was no price difference between accessible apartments and non-accessible apartments in those complexes.

### Evidence Regarding the BRC

Jones testified by deposition that she was an insurance adjuster at Inservices, Inc. at the time of Dennis' accident. She stated that she was the adjuster assigned to Dennis' claim and that she handled the claim from the time of the accident through the BRC. Jones recalled that in 2000 Dennis approached *her* about settling his claim to receive a lump sum rather than weekly benefits. She said that Dennis had reached maximum medical improvement about a year before he approached her and that she had worked with his attorney on that issue. Once Dennis discharged his attorney she dealt with him directly. She stated that the settlement was not reached prior to the BRC and recalled that the settlement was based upon 400 weeks of benefits.

Jones testified that she never advised Dennis to terminate his relationship with his lawyer. She also stated that she never

advised Dennis as to the maximum or minimum benefits he could receive. She testified:

> We basically just explained to him what he would be entitled to if he were to request a hearing or go before the benefit review conference. But there was no minimum or maximum. He could be entitled to benefits for the rest of his life or he could—they could find that he would be capped at 400 weeks because he wanted to start his own business and go to work for himself.

Jones testified again in response to a question from Dennis' attorney that she had advised Dennis that he could get benefits for the rest of his life, but said she had not done so in writing. She also testified that she gave Dennis the Tennessee DOL's phone number and advised him to speak with an ombudsman regarding his claim.

Byas, the mediator, also testified by deposition. She stated that she had been with the DOL since 1988 and was currently a Workers' Compensation Specialist I. Byas testified that she did not remember whether Dennis ever asked her about permanent total disability benefits and does not remember whether she volunteered the information. When asked if she ever told Dennis the maximum he could receive was 400 weeks, Byas stated "I probably *did*, but I am not sure of that either." (Emphasis added.) She stated that she did not ask him if he wanted to be represented by an attorney, explaining, "I assume that if they come in without an attorney, they understand. That's their choice." Byas said that she normally does not volunteer information to claimants about permanent total disability benefits but will explain the benefits if she is asked. She did not recall if Dennis asked.

Like Dennis, Byas recalled that the only persons present at the BRC were Jones, Dennis, and herself. She recalled that at the BRC, Jones offered Dennis 400 weeks of benefits and he accepted the offer. The bulk of the BRC was taken up with structuring how to pay the 400 weeks of benefits. She recalled that the BRC lasted about an hour.

Gaines testified by deposition that he is employed with the DOL. He was a Workers' Compensation Specialist senior to Byas at the time of Dennis' BRC. He stated that he did not recall whether he participated in Dennis' BRC but that it would not have been normal practice for him to be present. Gaines explained that he signed the settlement agreement on Byas' behalf because she was not available and that he also signed the document approving the settlement on behalf of the DOL. He did not recall discussing permanent disability benefits or discussing any specifics of the agreement with Dennis. Gaines acknowledged that under the statute it is the responsibility of either the mediator or the person approving the settlement to explain to the employee the scope of benefits available, but did not recall whether he did so or not.

Gaines explained that in his view, the role of the mediator is not to approve the settlement per se, but to facilitate it and to record it. It is not the mediator's job to advocate or decide whether the agreement is fair. The specialist who approves the agreement is responsible for ensuring that the employee is receiving substantially the benefits he is entitled to receive. Gaines conceded that "[t]here is not anything in the documents I have [regarding Dennis' settlement] that mentions permanent total disability benefits."

### Trial Court's Order

On May 23, 2002, nearly two years after the BRC, Dennis filed a petition in the Rutherford County Chancery Court seeking to set aside the settlement. The peti-

tion alleged that the settlement had been entered into in violation of Tennessee Code Annotated section 50–6–206. Following a trial during which the above evidence was presented, the trial court set aside the settlement mediated at the BRC, finding that "[t]he workers' compensation specialists involved in this matter failed to perform their duties all to the detriment of the employee." Having set aside the settlement, the court ordered permanent total disability benefits, holding that "as of July 11, 2000, Henry Dennis was permanently and totally disabled and entitled to benefits of $387.39 per week, until he is by age eligible for" Social Security benefits. The court credited the employer's payment of benefits pursuant to the settlement and ordered that payments under its order begin the week of July 24, 2006. Finally, the court found that "[c]learly there is a medical need for the plaintiff to live in wheel chair [sic] accessible housing." The court observed, however, that, "[w]hile it may be cheaper to the employer to furnish wheel chair [sic] accessible housing rather than daily medical treatment, the statute does not specify that the employer shall furnish housing." The court held that the workers' compensation statute's requirement that the employer furnish "other apparatus," Tenn.Code Ann. § 50–6–204(a)(1), was limited to medical supplies and "would not apply to the costs of the housing itself."

Erin Truckways appealed. We accepted review before the case was heard or considered by the Special Workers' Compensation Appeals Panel.

### Analysis

Erin Truckways argues that the trial court erred in setting aside the settlement, that the trial court erred in determining that Dennis is permanently and totally disabled, and that the trial court erred in calculating Dennis' compensation rate. Dennis argues that the trial court correctly determined these issues. Dennis also argues that the trial court erred in determining that Dennis was not entitled to the full cost of wheelchair-accessible housing as a medically-necessary expense. We will consider each issue in turn.

### Setting Aside the Settlement

Erin Truckways contends that the trial court erred in setting aside the settlement for three reasons. First, it argues that the trial court erred in concluding that the procedural safeguards contained in Tennessee Code Annotated section 50–6–206 (2005) ("section 206") were not met. Next, it argues that Dennis' petition to set aside the settlement was untimely. Finally, it argues that the settlement should not have been set aside under Tennessee Rule of Civil Procedure 60.02. Dennis argues that the procedures in section 206 were not adhered to, that his petition was timely, and that Rule 60.02 is not relevant because the trial court did not rely on it. We agree with Dennis and affirm the trial court.

Section 206, which has not been amended in pertinent part since the date of Dennis' injury, sets forth the requirements and procedures for settling workers' compensation cases. The section provides that the "parties shall have the right to settle all matters of compensation between themselves...." Tenn.Code Ann. § 50–6–206(a)(1). The section states that settlements generally must be reduced to writing and approved by a chancery or circuit court, *id.*, but permits "[t]he commissioner of labor and workforce development or the commissioner's designee," rather than a court, to approve a settlement if the following safeguards are followed:

(A) The settlement agreement has been signed by the parties;

(B) The commissioner or the commissioner's designee has determined that the employee is receiving, substantially, the benefits provided by the Workers' Compensation Law, compiled in this chapter, or, in cases subject to subsection (b), the best interest of the employee; and

(C) If the employee was not represented by counsel at a benefit review conference, the settlement agreement shall be reviewed by a specialist within the department who was not associated with the employee's case.

*Id.* § –206(c)(1).[1] The section further provides that, "[a]mong the parties, a settlement approved by the commissioner pursuant to this subsection (c) shall be entitled to the same standing as a judgment of a court of record...." *Id.* § –206(c)(2).

Section 206 also imposes certain additional procedural safeguards when the employee is not represented by counsel. First, the section requires that if the employee is not represented, "the parties *shall* seek the approval of a court pursuant to subsection (a), *unless* the parties *agree* to seek approval from the department pursuant to this subsection (c)." *Id.* § –206(c)(3)(B) (emphases added). Additionally, the section provides that if the employee is unrepresented, "the commissioner or the commissioner's designee *shall thoroughly inform* the employee of the scope of benefits available under the Workers' Compensation Law ... the employee's rights[,] and the procedures necessary to protect those rights." *Id.* § –206(c)(5) (emphasis added).

Dennis first argues that the trial court properly set aside the settlement because Byas did not "determine[ ] that the employee is receiving, substantially, the benefits provided by the Workers' Compensation Law" as required by section 206(c)(1)(B). He argues that because he was entitled to permanent total disability, he did not receive "substantially" the benefits to which he was entitled, and so the specialists Byas and Gaines necessarily could not have determined that he was receiving the benefits to which he was entitled. Dennis also notes that the settlement documents only refer to permanent partial disability, without mentioning permanent total disability. Because, as we conclude below, the trial court correctly determined that Dennis is permanently and totally disabled, we agree that he did not receive "substantially" the benefits to which he was entitled as directed by section 206(c)(1)(B).

Dennis also argues that the mediation did not comply with section 206(c)(3)(B), which requires that settlements involving unrepresented employees be approved by the court unless the parties agree to seek approval from the department instead. We agree with Dennis that this safeguard was violated as well. The settlement agreement was not approved by a court; rather, it was approved by Workers' Compensation Specialist Gaines. There is no indication on the settlement agreement and no other proof in the record that the parties agreed to have a representative from the department approve the settlement rather than submitting it to the court.

 Finally, Dennis argues that neither Byas nor Gaines "thoroughly inform[ed]" him of "the scope of benefits available under the Workers' Compensation Law," or of his "rights and the proce-

---

1. Subsection (b) applies when "there is a dispute between the parties as to whether or not a claim is compensable, or a dispute as to the amount of compensation due." *Id.* § –206(b). That subsection is not at issue in this case.

dures necessary to protect those rights" as required by section 206(c)(5). Erin Truckways argues that because Workers' Compensation Specialists are not intended to be advocates for unrepresented employees, they are only required to volunteer minimal information to employees about the types of benefits available. Therefore, the Specialists are not required to explain the differences between those benefits to unrepresented employees. The statute, however, states that employees must be "[t]horoughly informed of the *scope* of benefits," not just the fact that benefits exist. In our view, the statute requires a detailed explanation of the full range of benefits available to each employee, including but not limited to an explanation of the difference between permanent partial disability benefits and permanent total disability benefits, the amount and duration of compensation available under each type of benefit, and the eligibility requirements for each type of benefit.

Erin Truckways argues that Dennis' claim that he was consistently told and that he believed that he could only get 400 weeks of benefits is implausible. First, Erin Truckways argues that because Dennis was represented by two different attorneys prior to pursuing his claim pro se, he must have known that he was at least potentially entitled to permanent total disability benefits. Attorney Lype testified by deposition that he filed a complaint alleging permanent total disability and, alternatively, permanent partial disability. Lype also testified that he would not have told Dennis that Dennis was only entitled to a maximum of 400 weeks of benefits, and that his usual practice is to send a copy of the complaint to the plaintiffs he represents. Dennis testified, however, that he did not read the complaint. Erin Truckways also points to the insurance adjuster Jones' testimony that she never told Dennis that he was only entitled to

400 weeks of benefits and that she told him that he could get benefits for the rest of his life.

The trial court credited the testimony of Dennis and the mediator Byas over the testimony of Jones, and the evidence does not preponderate against the trial court's finding. Dennis testified consistently that he was never told he would be entitled to more than 400 weeks of benefits. Moreover, Byas testified that she "probably did" tell Dennis he could only get 400 weeks of benefits based on the fact that he was a paraplegic rather than a quadriplegic. Additionally, the Specialist who approved the settlement, Gaines, also had no recollection of discussing permanent total disability benefits with Dennis. In sum, we agree with the trial court's conclusion that "[t]he workers' compensation specialists involved in this matter failed to perform their duties all to the detriment of the employee." As we explained in *Lindsey v. Hunt*, 215 Tenn. 406, 384 S.W.2d 441 (1964) (overruled on other grounds by *Betts v. Tom Wade Gin*, 810 S.W.2d 140, 144 (Tenn.1991)), when an employee is unrepresented in a workers' compensation settlement,

> the highest degree of care should be used by the reviewing judge to make sure that the rights of the employee are being upheld under the Compensation Law. The[re] is more than the welfare of the worker at stake in this respect, because the public also has a vested interest in the fair administration of the Compensation Laws.
>
> "[T]he entire compensation system has been set up and paid for, not by the parties, but by the public. The public has ultimately borne the cost of compensation protection in the price of the product, and it has done so for the specific purpose of avoiding having the disabled victims of industry thrown on pri-

vate charity or local relief. To this end, the public has enacted into law a scale of benefits which will forestall such destitution. It follows, then, that the employer and employee have no private right to thwart this objective by agreeing between them on a disposition of the claim that may, by giving the workman less than this amount, make him a potential public burden."

*Id.* at 443–44 (quoting 2 *Larson's Workmen's Compensation Law,* § 82.41). Section 206 sets forth a number of procedural safeguards intended to protect the rights of unrepresented employees. Given the fact that at least three of these safeguards were ignored, and the fact that the evidence shows that Dennis did not understand the full range of his rights at the time he entered into the settlement, we affirm the trial court's decision to set aside the settlement.

■ We also reject the employer's argument that Dennis' petition to set aside the settlement was untimely. The employer relies on section 206(a)(1), which provides in pertinent part,

> If it appears that any settlement *approved by the court* does not secure to the employee in a substantial manner the benefits of the Workers' Compensation Law, the settlement may, in the discretion of the trial judge, be set aside at any time within thirty (30) days after the receipt of such papers by the division, upon the application of the employee or the administrator of the division in the employee's behalf....

(Emphasis added.) As we have discussed, however, this settlement was not approved by the court, so in our view, the 30–day limit is not applicable. Although section 206 provides that settlements "shall be entitled to the same standing as a judgment of a court of record," *id.* § –206(c)(2), the settlement was not approved in accor-

dance with the other procedures set forth in section 206. Because Tennessee Code Annotated section 50–6–240 (2005) provides that "[a] settlement is not effective unless it is approved in accordance with § 50–6–206," the settlement was not "effective" and is not entitled to the same standing as a judgment.

■ Finally, Erin Truckways argues that the trial court erred in setting aside the settlement pursuant to Tennessee Rule of Civil Procedure 60.02. Rule 60.02 provides that relief may be had from judgments or orders for such reasons as mistake, excusable neglect, or fraud. The rule also provides, however, that it "does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order or proceeding...." *Id.* We agree with Dennis that we need not analyze whether relief from the settlement would have been proper under Rule 60.02, because the trial court did not rely on the rule in setting aside the settlement. Rather, the court relied on its inherent authority to set aside the settlement where it did not comply with the applicable law, and we affirm the trial court's exercise of its discretion.

### Permanent and Total Disability

■ Next, Erin Truckways argues that the trial court erred in determining that Dennis is permanently and totally vocationally disabled. We will affirm the trial court's determination that Dennis is permanently and totally disabled unless the preponderance of the evidence is otherwise. *Jones v. Hartford Accident & Indem. Co.,* 811 S.W.2d 516, 522 (Tenn.1991). Dr. Apple, Dennis' treating physician at the time he reached maximum medical improvement, assigned him a 75% anatomical impairment to the body as a whole. Dr. Simon, who treated Dennis at the time of trial, testified that Dennis' disability is per-

manent. Dennis has an eighth-grade education and has no vocational training other than a short course enabling him to earn his commercial truck driving license. His only work experience is driving trucks and performing manual labor. The evidence does not preponderate against the trial court's conclusion that Dennis is totally and permanently disabled.

### Compensation Rate

■ Erin Truckways next argues that the trial court erred in calculating Dennis' compensation rate. The settlement provided that Dennis' actual average weekly wage was $581.06 and that his compensation rate would be set at the applicable statutory maximum, $387.39. *See* Tenn. Code Ann. § 50–6–102(15)(A)(viii) (2005). The court used these same figures, ordering that benefits be paid at $387.39 per week. Erin Truckways argues that because the trial court set aside the settlement, it erred in ordering that Dennis be paid at the compensation rate negotiated at the BRC. Dennis argues that there is no evidence that the compensation rate was negotiated at the BRC and that the only evidence in the record supports the trial court's conclusion.

Dennis worked for Erin Truckways for only twelve weeks prior to his injury. The Workers' Compensation Law provides that where an employee has been employed for less than 52 weeks, the average weekly wage is determined by "dividing the earnings during that period by the number of weeks and parts thereof during which the employee earned wages ... provided, that results just and fair to both parties will thereby be obtained." Tenn.Code Ann. § 50–6–102(3)(B). In other words, the statute provides that Dennis' average weekly wage should be calculated by dividing his total actual earnings by twelve.

Dennis is correct that the only evidence in the record regarding the compensation rate supports the trial court's conclusion. Attached to Jones' deposition is a "Notice of First Payment of Workers Compensation" filed with the DOL. The notice is dated January 9, 1998, and was signed by Jones. The notice states that Dennis' average weekly wage was $581.84 and that his weekly compensation rate was $387.39. Erin Truckways asserts that it filed a wage statement in 1999 showing that Dennis' average weekly wage was $198.97. However, that wage statement is not in the record. Nor is there anything in the record showing Dennis' total earnings during the twelve weeks that he worked for Erin Truckways. The only evidence of Dennis' wages contained in the record is the notice filed by Jones with the DOL on January 9, 1998. This wage statement was filed over two years prior to the BRC—indeed, it was filed just two months after the accident, prior to any legal action on Dennis' claim. There is no reason to believe that this statement did not accurately reflect Dennis' wages and compensation rate, as it was filed and prepared by Jones, the insurance adjuster. Because Dennis' petition requested that the trial court set aside the settlement and "that the matter be heard on its merits and the Plaintiff be granted total disability benefits," the issue of Dennis' compensation rate was properly before the court, and the employer was on notice of the need to submit proof of the appropriate rate. The evidence does not preponderate against the trial court's determination that Dennis' compensation rate should be set at $387.39.

### Medically–Necessary Housing

■ Finally, Dennis argues that the trial court erred in holding that the workers' compensation statute does not require an employer to cover the cost of wheelchair-accessible housing. Erin Truckways

argues that the trial court interpreted the statute correctly.

The Workers' Compensation Law requires that employers furnish certain medical necessities to injured employees, providing in pertinent part:

> The employer or the employer's agent shall furnish free of charge to the employee such medical and surgical treatment, medicine, medical and surgical supplies, crutches, artificial members, and other apparatus, including prescription eyeglasses and eye wear, such nursing services or psychological services as ordered by the attending physician and hospitalization, including such dental work made reasonably necessary by accident as defined in this chapter, as may be reasonably required....

Tenn.Code Ann. § 50–6–204(a)(1) (2005). Dennis argues that because the Workers' Compensation Law is to be construed in favor of employees, we should broadly interpret "other apparatus" to include housing. Erin Truckways argues, and the trial court agreed, that such an interpretation is not supported by the statute.

 Although it is true that the Workers' Compensation Law "is remedial in nature and is to be given a liberal and equitable construction in favor of workers," *Long v. Mid–Tennessee Ford Truck Sales, Inc.,* 160 S.W.3d 504, 510 (Tenn. 2005), the language of the statute simply cannot sustain the analytical leap necessary to construe housing as "medical apparatus." The statute includes as examples of "medical apparatus" such items as "crutches, artificial members" and "prescription eyeglasses and eye wear." The statute contemplates specialized accessories and aid particularly necessary to an injured employee. It does not contemplate basic necessities of life, such as housing.

In *Wilhelm v. Kern's, Inc.,* 713 S.W.2d 67 (Tenn.1986), this Court ordered the employer to pay $1200 per month to cover the cost of housing in a halfway house where the employee had suffered a work-related mental illness. The $1200 included room, board, laundry, and supervision of the employee. The Court concluded that, because the employee was schizophrenic and his doctor had testified that it was medically necessary for him to live in a supervised environment, the cost of the halfway house was a permissible "nursing service[ ]" under the statute. *Id.* at 69. The Court also relied on the doctor's testimony that, in his opinion, the entire $1200 monthly fee was a "medical expense" because it was "needed for [the employee's] proper psychiatric care and treatment." *Id.; see also Squeo v. Comfort Control Corp.,* 99 N.J. 588, 494 A.2d 313, 322 (1985) (housing for quadriplegic employee covered where employee required extensive nursing care and suffered from severe mental depression resulting in numerous suicide attempts).

In *Wilhelm,* unlike in this case, the evidence showed that the employee required specialized, continuous nursing supervision because of his psychiatric condition. The physician testified that the employee required "institutionalization" for his schizophrenic condition. Because the statute states that "nursing services" are covered, it was within the contemplation of the statute that the expense of the halfway house—which was essentially placement in a supervised nursing facility—was covered. In this case, the evidence shows that Dennis does not require continuous care and supervision. Rather, the evidence shows that he is capable of a great deal of independence and could be even more independent with the addition of modifications to make his home wheelchair-accessible.

 The purpose of workers' compensation is to replace lost wages. *See, e.g.,*

*Van Hooser v. Mueller Co.*, 741 S.W.2d 329, 330 (Tenn.1987). From that compensation, it is contemplated that an injured employee will purchase the necessities of life such as food and shelter. Compensation rates are set with the assumption that the payments will be used by injured employees to cover such ordinary and necessary expenses. Requiring an employer to pay the full cost of specialized housing would be an unintended windfall for the injured employee because it would relieve that employee of the entire cost of housing—a cost which the statute contemplates he will be paying with the wage-replacement he receives in the form of compensation benefits.

 This does not mean, however, that the employer has no responsibility under the Workers' Compensation Law to supply the modifications necessary to make housing wheelchair-accessible to an injured employee confined to a wheelchair. It is undisputed that wheelchair-accessible housing is medically necessary for Dennis. Dr. Simon testified that accessible housing was medically necessary for both Dennis' physical and psychological health. Unlike the entire cost of housing itself, in our view, modifications such as ramps, grab bars, widened doorways, and accessible cabinets and appliances are within the statute's definition of "apparatus" when such modifications are found to be medically necessary. If it is possible to modify the injured employee's existing home, then the employer shall bear the cost of all modifications deemed medically necessary.

 The proof at trial appeared to show that Dennis' mother's house cannot be modified to accommodate Dennis' wheelchair. We therefore remand to the trial court to act as a Master to determine two other alternatives: 1) the availability and cost of wheelchair-accessible housing for Dennis only; and 2) the availability and cost of non-accessible housing capable of modification, and the cost of modification to make such housing wheelchair-accessible. We reserve judgment on the question of whether the statutory phrase "other apparatus" as used in Tennessee Code Annotated section 50–6–204(a)(1), may be construed to require the employer to pay for any of these alternatives until the trial court makes its findings of fact. The trial court shall hold a hearing, make findings, and report to this Court within 90 days.

### Conclusion

Having reviewed the record and applicable authority, we affirm the decision of the trial court to set aside the settlement. We also affirm the trial court's holding that Dennis is permanently and totally disabled and affirm the award of compensation ordered by the trial court. Finally, we hold that although the Workers' Compensation Law does not contemplate an employer paying for wheelchair-accessible housing in its entirety, the Law does require the employer to pay for medically-necessary modifications to make existing housing wheelchair-accessible. We reserve judgment and remand to the trial court to make factual findings as to the availability and cost of the appropriate remedy in this case. Costs shall be taxed to the appellant, Erin Truckways, Inc., a/k/a/ Digby Truck Lines, et al., and their sureties, for which execution may issue if necessary.