Ben **DELGADO**, Plaintiff–Appellant,

v.

Jerry **MITCHELL** and Camelback Castle Corporation, Defendants–Respondents.

No. 23908.

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 27, 2001.

Randy R. Cowherd, Newberry, Haden, Cowherd, Bullock, Keck & McGinnis, L.L.C., Springfield, Larry G. Luna, Branson, for appellant.

Gary W. Allman, Allman, Ingram, Wilson & Akers, LLC, Hollister, for respondent.

SHRUM, Presiding Judge.

Ben Delgado ("Plaintiff") sued Jerry Mitchell ("Mitchell") and Camelback Castle Corporation ("Castle Corp."), alleging they ("Defendants") owed Plaintiff rent under an oral contract.[1] Specifically, Plaintiff alleged Defendants stored their full-sized antique railroad train on Plaintiff's property for a monthly rental amount that Defendants had not fully paid. Defendants counterclaimed, alleging Plaintiff breached his oral promise to put the train engine on blocks and secure the entire train "from vandals, the elements and other potential hazards."

After a non-jury trial, the court entered judgment for Plaintiff on his rent claim and for Defendants on their counterclaim against Plaintiff. Plaintiff appeals from the judgment favorable to Defendants on their counterclaim. This court reverses and remands for further proceedings.

---

1. In referring to Mitchell and Castle Corp. collectively, we call them "Defendants."

During the period relevant to this discussion, Defendants owned a "full-sized, antique train consisting of a steam locomotive and coal car, two yellow passenger cars, one red boxcar, one iron flat car, one yellow utility car with a Hercules diesel engine, and one red caboose car."[2] There was a period when Defendants operated the train as a tourist attraction on "Old Greta Road" in Branson, Missouri. However, sometime before January 1997, Mitchell sold "the business and ranch" and had to move the train. Accordingly, Mitchell, acting for himself and Castle Corp., contracted with Plaintiff to store the train on a nearby real-estate parcel owned by Plaintiff. As consideration for the storage site, Defendants agreed to pay Plaintiff a monthly rental amount.[3]

At trial, Plaintiff insisted that this comprised the entire contract between the parties, i.e., train storage site in exchange for monthly rent. Mitchell testified otherwise, saying he paid Plaintiff $1,500 for which Plaintiff agreed to (1) "jack up" the train engine and put blocks under its four "driver" wheels, and (2) nail "plywood over the windows[,] on the cars and ... caboose." Mitchell explained he wanted the driver wheels "out of the mud to where they wouldn't rust" and wanted to "protect the windows[ ]" of the caboose and two passenger cars. Defendants put in evidence the remittor's copy of a $1,500 money order purchased by Mitchell, payable to Plaintiff, on which appeared this hand-written notation: "Jack up engine and train plus board up windows and door." This document was dated November 21, 1996. Although Plaintiff denied such agreement existed and denied the $1,500 was given him for those reasons, he did put plywood over the

train windows after two young boys broke some windows and put "duffel bags ... [,] candies ... [,] CDs and things like that[ ]" in the caboose. Plaintiff's employee, Billie Rainbolt, testified the plywood installation "could have been" done in the "[s]ummer or fall of '98." The train engine was never jacked up and put on blocks.

Mitchell, who lived in Arizona, returned to Branson three times after the train was moved to Plaintiff's property and before this trial was held. During one of those visits, Mitchell saw that the train engine had not been blocked up and that the windows remained uncovered; yet, at that point the train remained in "good condition." Mitchell's efforts to talk with Plaintiff during those visits were unsuccessful and there were no further communications between the parties before this suit was filed.

Mitchell testified that, other than the engine was not running, the train was "in good condition" when it was moved to Plaintiff's property. Specifically, he characterized the caboose as the "cream puff of the whole deal[;]" that Defendants had reconditioned everything about the caboose and had also refurbished the two passenger cars. Defendants' evidence about the train's current condition at the time of trial and their claim for damages, included the following:

"Q. [to Mitchell] Have you seen the train recently?

"A. I saw it last night.

"Q. ... What condition is it in?

"A. From what I could tell there's not one window in the whole thing that's not broke out. I mean, they—they went through and broke every window and

2. The train description and the ownership allegation come from Plaintiff's petition and Defendants' answer which admits the allegation.

3. There was some dispute about the rental amount agreed upon but the rental amount is not an issue on appeal.

the doors with all the—the glass-there was wooden doors, custom-built doors with—the nice windowpanes and everything in them were just trashed....

"Q. What about the caboose?

"A. The—I couldn't—I couldn't see in the caboose. I wasn't able to get in the caboose last night. I just run by there for a minute and it was just about dark.

"Q. What about the engine in the—

"A. The engine and everything is—is just—other than the—the rust where it's been sitting down there and I don't know how much damage that's done. If the—the drivers, you know, I don't know what damage the rust has done.

"Q. When you say the drivers, you're talking about the wheels that were—

"A. The wheels.

"Q.—that you want jacked up?

"A. ... You know, it's setting there in the weather—and that—that's nobody's fault on the ... weather. I mean, that's just part of it. The part that ... I'm upset about is the inside.... If the train would have been boarded up and jacked up when I paid for it to be done there's a lot of damage that wouldn't have happened. The kids—There's a good chance—Kids could have tore the boards off and broke the windows out anyway but I don't think they would have."

Mitchell then testified that Plaintiff's failure to "board up" the cars and his failure to block up the engine "hurt the train $150,000 worth[ ]" and requested judgment for that amount. Mitchell explained his request for a $150,000 judgment as follows: "[T]o put the caboose and the two cars back like they were inside, before the rain and all that and everything got to it, I think you're talking $50,000 a unit."

Later, during cross-examination, Mitchell conceded that since he had not looked inside the caboose the previous evening, his opinion about damages to the caboose was "based on what [he] observed ... [o]n the other two cars." Moreover, when questioned about his inspection of the passenger cars, Mitchell testified he never went inside them; that he could "see through the doors where the boards are not wide enough to cover up all the holes...." Continuing, he explained: "Some of the plywood they put on lacked about that much covering ... the gaps and ... it gives you light inside." Mitchell's testimony continued as follows:

"Q. So that's your basis for assessing the damage ... to the passenger cars?

"A. My assessing the damage to the three cars, the—the damage on the three cars, the drivers on the engine that wasn't jacked up and all of the stuff missing out of the caboose is—is way more than $150,000.

"Q. Okay. That's not my question. My question is, is your assessment of what damage occurred inside the ... passenger car ... based upon peering through that window?

"A. Yes, sir."

Ultimately, Defendants rested without evidence that shed additional light on the existence, amount, or cause of Defendants' damages. Even so, the trial court entered judgment for $180,000 favorable to Defendants and against Plaintiff on Defendants' counterclaim. Plaintiff appealed from the judgment thus entered.

■ This court's review of a court-tried breach-of-contract case is governed by Rule 84.13(d)(3) and *Murphy v. Carron*, 536 S.W.2d 30 (Mo.banc 1976). *Brown v. Mercantile Bank of Poplar Bluff*, 820 S.W.2d 327, 334 (Mo.App.1991). Thus, we will affirm the judgment of the trial court unless there is no evidence to support it, it is against the weight of the evidence, or it

erroneously declares or applies the law. *Id.* at 334[1]. Where, as here, the trial court makes no findings of fact, this court considers all fact issues to have been found in accordance with the result reached. *Id.* at 334[2].

Plaintiff's first point, which is dispositive, maintains the court erred in entering a $180,000 judgment for Defendants because Defendants never met their burden of proving the existence of that amount of damages with reasonable certainty. Plaintiff insists the judgment "was not supported by substantial evidence" because the only damage evidence came from Mitchell and his testimony as to the purported damages "was based on speculation and conjecture since he had not personally observed such damage[.]"

To be sustainable on appeal, a damage award must be based on more than " 'a gossamer web of shimmering speculation and finely-spun theory.' " *See Carmel Energy, Inc. v. Fritter,* 827 S.W.2d 780, 783 (Mo.App.1992) (quoting *Massey v. Goforth,* 305 S.W.2d 894, 897 (Mo.App. 1957)). Thus, a party claiming damages for breach of contract bears "the burden of proving the existence and amount of damages with reasonable certainty." *American Laminates, Inc. v. J.S. Latta Co.,* 980 S.W.2d 12, 23[15] (Mo.App.1998).[4] Stated otherwise, "[p]roof of actual facts which present a basis for a rational estimate of damages without resorting to speculation is required." *Meridian Enterprises Corp. v. KCBS, Inc.,* 910 S.W.2d 329, 331[2] (Mo. App.1995). Additionally, the *cause* of the damage claimed must be proven with reasonable certainty. *Herbert & Brooner*

4. Traditionally, courts have required a greater certainty in the proof of contract damages than they have in the proof of tort damages.

*Const. Co. v. Golden,* 499 S.W.2d 541, 552[25] (Mo.App.1973).

These rules attend because it would be plainly unjust for a trier of fact to compel a party to pay damages for something that may or may not have resulted and which are merely problematical or were not caused by the breach of contract. *See First Nat'l Bank v. Kansas City S. Ry.,* 865 S.W.2d 719, 739 (Mo.App. 1993). An appellate court will reverse a judgment that awards damages for breach of contract *if* the record shows an absence of proof of actual facts that present a basis for a rational estimate of damages without resort to speculation. *See Rufkahr Const. Co. v. Weber,* 658 S.W.2d 489, 501–02 (Mo. App.1983); *See Golden,* 499 S.W.2d at 550– 52.

Missouri courts will ordinarily allow an owner of property to testify, although the owner is not an expert, as to the value of an item of personalty in its undamaged state, *DeWitt v. American Family Mut. Ins. Co.,* 667 S.W.2d 700, 708[20] (Mo.banc 1984), and in its damaged condition. *Claas v. Miller,* 806 S.W.2d 141, 145[4] (Mo.App.1991). However, "when an owner's opinion is based on improper elements or foundation, his opinion loses its probative value." *Fritter,* 827 S.W.2d at 783[10]. "[W]here the basis for a test as to the reliability of the testimony is not supported by statement of facts on which it is based, or the basis of fact does not appear to be sufficient, the testimony should be rejected." *Id.* at 783[11]. "Judicial liberality in permitting an owner to testify as to his opinion of the amount of the loss does not allow an unrestricted right to engage in guesswork." *Id.* at 783[12].

RESTATEMENT (SECOND) OF CONTRACTS, § 352 comment a.1 (1981).

The only evidence in this record concerning the existence, cause, and amount of damages is sketchy in material respects and does not rise to the level of substantial evidence sufficient to support an award of $180,000. Mitchell's damage assessment— which was Defendants' only damage evidence—included damages inside the caboose and to the engine drivers as significant factors, yet Mitchell conceded he had never seen inside the caboose (which Mitchell had described as the "cream puff of the deal") after it was moved to Plaintiff's property. He also admitted he "didn't know how much damage ... the rust had done" to the drivers. It follows, therefore, that Mitchell's testimony that Plaintiff's failure to jack up the engine and get the "drivers" out of the mud and his failure to board up windows on the two passenger cars and caboose had "hurt the train $150,000 worth" is not supported by a sufficient basis of fact. *See Fritter*, 827 S.W.2d at 783[11].

We are confirmed in this view by Mitchell's additional testimony that he based his $150,000 figure on his opinion that the interiors of the two passenger cars and the caboose had each been damaged in the amount of $50,000. As Mitchell explained it, his only inspection of the train in its damaged state occurred when he visited the train storage site the evening before trial. Specifically, he ran "by there for a minute ... about dark[,]" peeked through the boarded-up windows on one passenger car, looked through a broken door window on another passenger car, and from that single inspection concluded the passenger cars each had been damaged in the amount of $50,000. Continuing, Mitchell testified his opinion that the caboose had been damaged $50,000 was "based on what [he] observed ... [o]n the other two cars." Such testimony lacks probative value and should

have been rejected accordingly. *Id.* The finding of the court that damages were $180,000 is not supported by the evidence.

In reaching this conclusion, we do not ignore Mitchell's belated claim, first made during cross-examination, that his damage estimate included tools and other personalty taken from the boxcar. Specifically, Mitchell testified that "the boxcar [had been] full" of railroad museum pieces such as tools, lanterns, and railroad signs at the time it was moved to Plaintiff's property. He further testified that "we had it [the boxcar] nailed up and tin over it and everything else to where they couldn't get in[,]" but that vandals "broke in and took all the tools" and lighter weight items out of the boxcar. However, on this record the fact that items were stolen from the boxcar could not properly be part of Defendants' damage estimate. This follows because Defendants' counterclaim was based solely on their assertion Plaintiff had breached his contractual obligations. The only evidence of Plaintiff's contractual obligations was that he was to "put plywood over the windows ... so that it would protect the windows ... on the cars and caboose" and put blocks under the engine driver wheels. The evidence, including photographic exhibits, showed the boxcar had no windows; consequently, no evidence existed that Plaintiff had any contractual obligation relating to the boxcar. Moreover, Mitchell's testimony was that Defendants had "nailed up and [put] tin over [the boxcar] ... where they couldn't get in." On this record, no reasonable inference could be drawn that Plaintiff had a contractual duty to put plywood on the boxcar or otherwise protect that car or its contents. We cannot discern what the trial court relied on as evidence to support the $180,000 verdict, but conclude that it erred to the extent it

included the missing boxcar contents as an item of damages for Plaintiff's breach of contract.

Because the evidence does not sustain the damage award rendered in Defendants' favor, the judgment is reversed and the case remanded for further proceedings regarding Defendants' counterclaim.

MONTGOMERY, J., and BARNEY, C.J., concur.