CENTRAL AMERICA HEALTH SCIENCES UNIVERSITY, BELIZE MEDICAL COLLEGE, Appellants,

v.

Mohammad R. NOROUZIAN a/k/a Mohammad Rahim Norouzian, Respondent.

No. WD 66100.

Missouri Court of Appeals, Western District.

Sept. 11, 2007.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 30, 2007.

---

William D. Cross, Daniel Bukovac, Brian R. Markley, Co–Counsels, Kansas City, MO, for appellants.

Daniel J. Baylard, Kansas City, MO, for respondent.

Before HOWARD, P.J., BRECKENRIDGE and NEWTON, JJ.

PATRICIA BRECKENRIDGE, Judge.

Central America Health Sciences University, Belize Medical College ("CAHSU"), appeals the trial court's judgment in favor of Mohammad R. Norouzian on his counterclaim for breach of contract, promissory estoppel, unjust enrichment, and violation of 42 U.S.C. section 1981. CAHSU sued Mr. Norouzian for breach of written agreement, "work, labor and services rendered," and declaratory relief, claiming that Mr. Norouzian failed to pay $4500 in tuition to CAHSU. Mr. Norouzian's counterclaims asserted that, as a medical student at CAHSU, he was discriminated against and was required to pay a higher tuition amount than he had contracted with CAHSU. Further, Mr. Norouzian claimed that CAHSU's withholding his diploma has delayed his career in the medical profession. CAHSU raises eight points on appeal.

In its first point, CAHSU asserts that the trial court erred in denying CAHSU's motion to set aside judgment and for a new trial because it showed good cause to vacate the judgment, in that CAHSU's failure to appear at trial was due to a mistaken belief that the trial date was continued. CAHSU claims in its second point that the trial court erred in entering judgment for Mr. Norouzian on his 42 U.S.C. section 1981 counterclaim because Mr. Norouzian alleged only religious discrimination, and 42 U.S.C. section 1981 does not provide a cause of action for religious discrimination.

In its third point, CAHSU asserts that the trial court erred in entering judgment for Mr. Norouzian on his 42 U.S.C. section 1981 counterclaim, because Mr. Norouzian failed to present evidence demonstrating that CAHSU discriminated against him on the basis of his race. CAHSU claims in its fourth point that the trial court erred in entering judgment for Mr. Norouzian on his breach of contract, promissory estoppel, and unjust enrichment counterclaims because there was not substantial evidence that CAHSU agreed to reduce his tuition beyond the first trimester of medical school.

In its fifth point, CAHSU contends that the trial court erred in awarding Mr. Norouzian $400,000 in actual damages on his counterclaim because he failed to present reasonably certain, non-speculative evidence of his actual damages. CAHSU claims in its sixth point that the trial court erred in awarding Mr. Norouzian $2,000,000 in punitive damages on his counterclaim because the law does not allow punitive damages for breach of contract, promissory estoppel, or unjust enrichment, and Mr. Norouzian did not make a case for a 42 U.S.C. section 1981 violation.

In its seventh point, CAHSU asserts that the trial court erred in awarding Mr. Norouzian $2,000,000 in punitive damages on his counterclaim because the damage award was not based on substantial evidence and the punitive damages award was excessive, unreasonable, and unsupported by the evidence. Finally, CAHSU claims in its eighth point that the trial court erred by denying CAHSU's request for a continuance because CAHSU's attorney withdrew shortly before trial and CAHSU was not given sufficient time to employ new counsel. Because this court finds reversible error in the court's judgment for Mr. Norouzian on his 42 U.S.C. section 1981 counterclaim, the actual damages award, and the punitive damages award, the judgment of the trial court is affirmed in part and reversed in part.

**Factual and Procedural Background**

CAHSU is a medical school with branches in Belize, Mexico, and the United States. Its principal place of business is

Belize. In May 1998, the Dean of CAHSU, Dr. Maurice Modavi, met Mr. Norouzian, a United States citizen and a resident of Jackson County. At the time, Mr. Norouzian was a medical student in the Dominican Republic. The Dominican government, however, shut down his medical school. Dr. Modavi offered students of the former school a $2000 tuition discount, from $5500 per trimester to $3500 per trimester, if they wished to transfer to CAHSU. Mr. Norouzian accepted the offer and applied to CAHSU.

On July 27, 1998, CAHSU sent Mr. Norouzian a letter to inform him that he was accepted to CAHSU and that he could begin his studies in September of that year. The letter required that it be signed and returned with a $2000 deposit if Mr. Norouzian wished to accept. Further, the letter stated, "YOUR TUITION FEE PER TRIMESTER WILL BE $5,500.00 USD, MATRICULATION FEE $2,000.00. * * NOTE: TUITION FEES ARE SUBJECT TO INCREASE WITHOUT NOTIFICATION."

Mr. Norouzian signed the acceptance letter on August 21, 1998. He then went to Dr. Modavi to ask him why the tuition listed in the acceptance letter did not match his offer of $3500 per trimester. In that meeting, Dr. Modavi prepared a handwritten document that Mr. Norouzian purports sets forth the true agreement between CAHSU and Mr. Norouzian.[1] The handwritten document is dated September 10, 1998, has the name "Mohammad Norouzian" written at the top, and is initialed by Dr. Modavi.

Mr. Norouzian requested to pay his tuition through an installment plan. Mr. Norouzian and an employee of CAHSU's bursar office signed the plan on August 21, 1998. The plan schedule called for Mr. Norouzian to make three payments for the fall 1998 trimester. The payments were to be $1267, $1266, and $1266, for a total of $3800, including a $100 installment plan fee.

Mr. Norouzian completed all the courses for his doctor of medicine degree on January 17, 2003.[2] On January 31, 2003, CAHSU gave Mr. Norouzian a certificate of completion but did not give him his diploma because CAHSU believed Mr. Norouzian's tuition was not paid in full. After some time, Mr. Norouzian began contacting Missouri state representatives to help him obtain his diploma from CAHSU. In November 2004, after it became apparent to Mr. Norouzian that CAHSU would not give him his diploma, he began work as a Kansas City International airport shuttle driver.

On March 8, 2004, CAHSU filed a three-count petition against Mr. Norouzian for breach of a written agreement; "work, labor and services rendered"; and declaratory relief. Specifically, CAHSU alleged that Mr. Norouzian owed the school $4500. Mr. Norouzian filed an answer and a four-count counterclaim against CAHSU for breach of contract, promissory estoppel, unjust enrichment, and violation of 42 U.S.C. section 1981. The counterclaim al-

---

1. The handwritten document's true purpose is unclear, as it appears to be the acknowledgment of a three-week tuition credit for Mr. Norouzian. Nevertheless, the document does have the words, "Tuition 3500/16," seemingly indicating that the tuition fee was $3500 per sixteen weeks, or one trimester. In addition to the date, Mr. Norouzian's name, and Dr. Modavi's initials, the handwritten document

also contains: "218.75 × 3 weeks," "656.25" boxed-in and next to what appears to be the word "credit," and "2000 SWCH + 3500/16 + 350" ("2000 SWCH" is boxed-in).

2. Mr. Norouzian took a leave of absence for an unspecified amount of time during his schooling at CAHSU for financial reasons.

leged that: (1) Mr. Norouzian overpaid CAHSU $7,562.50 and CAHSU owes that amount to him; (2) CAHSU's wrongful withholding of Mr. Norouzian's degree has put his medical career on hold, causing him substantial loss; and (3) CAHSU's failure to abide by the tuition reduction agreement "was the result of an illegal act of discrimination based on religion and in violation of 42 U.S.C. section 1981." The counterclaim sought both actual and punitive damages. CAHSU submitted its answer on March 18, 2005.

Daniel Champion initially represented CAHSU. On June 28, 2005, Mr. Champion filed his "notice of motion" and motion to withdraw as counsel of CAHSU. On July 27, 2005, the trial court issued an order permitting Mr. Champion to withdraw and setting the case for trial on September 19, 2005.

CAHSU failed to appear at trial. Mr. Norouzian withdrew his jury demand, and the court heard testimony from Mr. Norouzian. On the same day, the trial court entered judgment "in favor of Defendant and against Plaintiff on all of Plaintiff's Claims and in favor of Defendant and against Plaintiff on all Defendant's Counterclaims in the amount of $400,000.00, for actual damages and $2,000,000.00 for punitive damages."

Ten days later, on September 29, 2005, CAHSU's current counsel filed their entry of appearance with the trial court and filed a motion to set aside judgment and for new trial or, in the alternative, for trial de novo. Following the trial court's denial of CAHSU's motion for a new trial, CAHSU filed this appeal.

### No Error in Denying Motion to Set Aside Judgment and for New Trial

In its first point, CAHSU claims that the trial court erred by denying its motion to set aside the judgment and grant a new trial or trial de novo. CAHSU's claim is founded on Rule 75.01, which permits the trial court, for good cause, to vacate a judgment within thirty days after entry of judgment. CAHSU asserts that its failure to appear at trial was due to a mistaken belief that the trial had been continued, and, therefore, it demonstrated good cause under Rule 75.01 to vacate the judgment.

Rule 75.01 states, in pertinent part, "The trial court retains control over judgments during the thirty-day period after entry of judgment and may, after giving the parties an opportunity to be heard and for good cause, vacate, reopen, correct, amend, or modify its judgment within that time." The decision whether to set aside a judgment for good cause under Rule 75.01 is within the discretion of the trial court, "and that ruling will not be interfered with in the absence of an abuse of discretion." *Brueggemann v. Elbert*, 948 S.W.2d 212, 214 (Mo.App. E.D.1997). " 'An abuse of discretion occurs when a trial court's ruling is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration.' " *In re Marriage of Hendrix*, 183 S.W.3d 582, 587 (Mo. banc 2006) (citation omitted). " 'If reasonable persons can differ as to the propriety of the trial court's action, then it cannot be said that the trial court abused its discretion.' " *Id.* (citation omitted). "However, the discretion not to set aside a judgment is a good deal narrower than the discretion to set it aside, and [this court is] more likely to interfere when the trial court has denied the motion." *Meramec Valley Bank v. Joel Bianco Kawasaki Plus, Inc.*, 14 S.W.3d 684, 689 (Mo.App. E.D.2000). This court must decide whether the trial court abused its discretion in finding that CAH-

SU's reasons for failing to appear did not constitute "good cause."

■ "Good cause" under Rule 75.01 is interpreted liberally to serve its remedial purpose and to avoid manifest injustice. *Stroup v. Leipard,* 981 S.W.2d 600, 603 (Mo.App. W.D.1998). "Good cause" has no precise definition, but the term "encompasses the occurrence of mistakes or conduct that is not intentionally or recklessly designed to impede the judicial process." *Brueggemann,* 948 S.W.2d at 214.

CAHSU asserts that it failed to appear at trial because it mistakenly believed that the trial had been continued. In late June 2005, over two and a half months before the trial date, Mr. Champion informed CAHSU that he was filing a motion to withdraw as counsel. In that notice, Mr. Champion warned CAHSU: "CLIENT SHOULD NOTE THAT further proceedings may be held in this matter whether or not you are represented by counsel. You should retain other counsel immediately.... TRIAL Date: September 19, 2005 Time: 1:30 p.m." The notice was sent by email to both Dr. Modavi and Celeste Mohammed.[3] Despite Mr. Champion's strong premonition, CAHSU did not retain counsel until after judgment was entered against it.

Apparently, email was an important method of communication between Mr. Champion and CAHSU.[4] On July 22, five days before the hearing on the motion for leave to withdraw, Ms. Sofia, Dr. Modavi's assistant, emailed Mr. Champion and asked him to request a "90 day extension so that we can replace you."[5] Mr. Champion replied, "Representing you on this issue would be inconsistent with my motion to withdraw as counsel," and he advised CAHSU to seek other counsel and to have that person request the continuance.[6] Ms. Sofia's reply to Mr. Champion stated: "We're not asking that you stay on as counsel for another 90 days, just that the trial date be passed for at least 90 days so Plaintiff can retain new counsel. It is our understanding that this [is] a rather common motion to file."

Two days later, in a reply email sent to both Ms. Sofia and Dr. Modavi, Mr. Champion wrote that, because it appeared that CAHSU had yet to retain another attorney, he would inform the court of CAHSU's request, but he would not argue on CAHSU's behalf in support of the request. He also wrote, "please note that although

---

**3.** Ms. Mohammed's role in this matter is unclear. Mr. Norouzian alleges that she was CAHSU's local counsel in Belize. CAHSU alleges that she only referred CAHSU to Mr. Champion and that she has had no other role in this case whatsoever.

**4.** Copies of email messages between Ms. Sofia, Dr. Modavi's assistant, and Mr. Champion between July 22–25, 2005, were provided in Exhibit A of Dr. Modavi's affidavit. Email from Dr. Modavi's inbox were not provided, but the email messages to Ms. Sofia reflect that copies were also sent to Dr. Modavi.

**5.** The request for a continuance of the trial date apparently came from Dr. Modavi. The email to Mr. Champion from Ms. Sofia stated: "Dr. Modavi is out of town and he asked me to contact you and ask you if you can ask the courts for a 90 day extension so that we can replace you."

**6.** In this email, Mr. Champion noted that on July 13, Dr. Modavi sent him an email stating " 'I have contacted several attorneys from Kansas to take over the case. I am out of town but I will notify you by the beginning of next week who is taking over.' " Mr. Champion then noted that he had not heard from Dr. Modavi since that time. Mr. Champion later wrote: "If you need an extension, I strongly advise that you choose one of the attorneys whom [Dr. Modavi] was referring in his e-mail to me, have that attorney appear in court on July 27, enter his/her appearance, and then request the extension."

you are correct that asking for a continuance of the trial is very common, *it is just as common for these motions to be denied by the court.*" (Emphasis added.) The next day, July 25, Mr. Champion sent an email to both Ms. Sofia and Dr. Modavi, notifying them that Mr. Norouzian's attorney had agreed to the 90–day continuance, and wrote that he would so inform the court at the hearing on July 27. He also wrote, "Hopefully, because all parties agree, the Court will grant the continuance. I will let you know after the hearing."

Following the hearing on July 27, Mr. Champion sent this email to Dr. Modavi, Ms. Sofia, and Ms. Mohammed:

Hello everyone.

As you know, today was the hearing on my Motion to Withdraw as Counsel for Plaintiff. The Court granted my motion.

I also informed the Court that Plaintiff requested that the trial be continued for 90 days and that Defendant's counsel did not oppose the continuance. The court, however, denied the request for a continuance and stated that Plaintiff's new attorney will have to request the continuance.[7]

In his affidavit, Dr. Modavi alleges that he never saw the emails Mr. Champion sent to him on July 24 and 25. He alleges that Ms. Sofia advised him that counsel for Mr. Norouzian had agreed to the continuance, and based on that information, Dr. Modavi believed the trial date had been extended ninety days. As for the July 27 email from Mr. Champion, Dr. Modavi alleges that he never saw this email either, perhaps because he was traveling. Dr. Modavi alleges that, because he never saw this email, at no time prior to the Septem-

ber 19 trial date did he know that the court denied CAHSU's request for a continuance.

■ "On appellate review of a case tried without a jury, due regard shall be given to the opportunity of the trial court to have judged the credibility of witnesses." *Foster v. Vill. of Brownington,* 140 S.W.3d 603, 607 (Mo.App. W.D.2004) (citing Rule 84.16(d)(2)). "The trial court is vested with the discretion to believe or disbelieve all, part, or none of any witness' testimony." *Id.* This court "defer[s] to the trial court on questions of credibility of witnesses and the choice between conflicting evidence." *Warren v. Tom,* 946 S.W.2d 754, 757 (Mo.App. S.D.1997).

■ Although this court recognizes that "certain mistakes or document mishandling are good cause," *Young v. Safe–Ride Servs.,* 23 S.W.3d 730, 733 (Mo.App. W.D. 2000) (discussing the "good cause" requirement of Rule 74.05(d) for setting aside default judgments) *overruled on other grounds by McElroy v. Eagle Star Group, Inc.,* 156 S.W.3d 392, 401 (Mo.App. W.D. 2005), in this case, the trial court reasonably could have disbelieved Dr. Modavi's statements regarding his lack of knowledge that the trial court had denied CAHSU's request for a continuance. The trial court could have reasonably believed that Dr. Modavi was aware that the request for a continuance was denied and still failed to appear at trial, constituting conduct "intentionally ... designed to impede the judicial process." *Brueggemann,* 948 S.W.2d at 214. First, even if Dr. Modavi did not check his own email while he was traveling, Mr. Champion's emails were also sent to Ms. Sofia, whom Dr. Modavi would contact periodically to relay impor-

7. A copy of this email from Ms. Sofia's inbox was attached to Dr. Modavi's affidavit. A copy of the email from Dr. Modavi's inbox was not provided, but Ms. Sofia's copy shows that the same email was sent to Dr. Modavi at 9:05 A.M. on July 27, 2005.

tant information from emails and other communications. The trial court could have disbelieved that Ms. Sofia would fail to notify Dr. Modavi of something as important as the denial of CAHSU's request for a continuance, and instead notify him only that Mr. Norouzian's attorney agreed to the continuance.

Second, Dr. Modavi alleges that he was in Belize on July 27, the day Mr. Champion sent the email notifying him of the denial of a continuance. Belize is the principal place of business for CAHSU, and Dr. Modavi is the Dean of the school. While Dr. Modavi asserts that he was on a "trip to Belize," suggesting that Dr. Modavi does not reside in that country, the trial court could have concluded that he at least had email access while at the school's primary place of business.

Third, even if Dr. Modavi did not see the July 27 email from Mr. Champion on July 27, the court could have easily disbelieved Dr. Modavi's allegation that he never read the email before the trial date on September 19. Dr. Modavi's affidavit reveals that there were at least thirty days between July 27 and September 19 when he was not traveling.[8]

Finally, the trial court could have disbelieved Dr. Modavi's allegation that he never knew the contents of Mr. Champion's July 27 email simply because the email was also the notice to CAHSU that the trial court had granted Mr. Champion's motion to withdraw his representation. The evidence shows that CAHSU knew of Mr. Champion's withdrawal and, in turn, discloses that CAHSU knew the contents of the July 27 email. Dr. Modavi himself attests in his affidavit, "I thought Mr. Champion had a duty to represent CAHSU until and unless the Court permitted him to withdraw." Because Dr. Modavi's actions revealed his knowledge that Mr. Champion withdrew his representation of CAHSU, a reasonable person could conclude that CAHSU's mistakes and conduct was at worst intentionally and at best recklessly designed to impede the judicial process.

■ Nevertheless, even if the trial court believed Dr. Modavi's allegations and found no intentional conduct, the court could have reasonably determined that Dr. Modavi's actions constituted conduct that was "recklessly designed to impede the judicial process." *Id.* In similar contexts, "recklessness" has been defined as the " 'conscious choice of a course of action with knowledge of the serious danger' " that a judgment could result. *McElroy,* 156 S.W.3d at 406 (citation omitted) (discussing the "good cause" requirement of Rule 74.05(d) for setting aside default judgments). Thus, "[r]ecklessness involves some element of deliberateness and of risk." *Brueggemann,* 948 S.W.2d at 214.

First, even if the trial court believed that Dr. Modavi never saw the July 24, 25, and 27 emails from Mr. Champion, the trial court could have determined that Dr. Modavi's failure to read his email for nearly two months amounted to reckless behavior because a substantial amount of correspondence between him and his attorney regarding the pending case was via email.[9] Second, the trial court could have determined that Dr. Modavi's failure to

---

8. Dr. Modavi's affidavit shows that he was *not* traveling on July 30, between August 1–11, between August 24 and September 9, and September 13–14.

9. The legal file presented to this court contains six email messages between Mr. Champion and CAHSU from July 22–27. Mr. Champion's July 22 email to Ms. Sofia quoted a July 13 email from Dr. Modavi to Mr. Champion.

contact Mr. Champion, the court, or Mr. Norouzian's attorney about the status of the case was reckless. Even if Dr. Modavi did not know the contents of Mr. Champion's July 27 email, he was still aware that a hearing was to be held on July 27. Dr. Modavi knew that the hearing would be very important to his case; the hearing would determine whether CAHSU's counsel was to be permitted to withdraw and would decide whether a ninety day continuance would be granted. If Dr. Modavi truly did not know that Mr. Champion was granted permission to withdraw and that CAHSU's request for a continuance was denied, then the trial court could have easily found that Dr. Modavi's ignorance was a direct result of him not caring to know. Mr. Champion emailed the information to Dr. Modavi and his assistant, Ms. Sofia, a method of communication that both parties were accustomed to using in their correspondence over this case.

In sum, based on the record, the trial court could have reasonably disbelieved the allegations put forth by Dr. Modavi in his affidavit and found that Dr. Modavi's conduct was intentionally designed to impede the judicial process. Alternatively, the trial court could have believed Dr. Modavi's allegations and still reasonably found that Dr. Modavi's blatant disregard for the status of the case was recklessly designed to impede the judicial process. Therefore, the trial court did not abuse its discretion in refusing to set aside the judgment against CAHSU. CAHSU's first point is denied.

### No Error in Denial of Motion
### for Continuance

Because CAHSU's eighth point raises a claim for which the remedy is a new trial, that point is addressed next. CAHSU claims that the trial court erred and abused its discretion by denying its re-

quest to continue the trial date when CAHSU's attorney withdrew representation. CAHSU asserts that Missouri law permits the trial court to continue the trial date where an attorney withdraws shortly before trial. CAHSU contends, therefore, that the trial court erred by denying its motion to continue the case, which Mr. Norouzian did not oppose, to allow CAHSU sufficient time to employ new counsel.

■ "The record on appeal shall contain all of the record, proceedings and evidence necessary to the determination of all questions to be presented, by either appellant or respondent, to the appellate court for decision." Rule 81.12(a). "This rule requires an appellant to file a transcript and prepare a legal file so that the record contains all the evidence necessary for a determination of questions presented to the appellate court for a decision." *Bastain v. Brown,* 28 S.W.3d 494, 495 (Mo. App. E.D.2000). "Where … the record does not contain all information and documents necessary for this [c]ourt to determine an issue presented on appeal, review by this court is impossible, and the claim of error must be dismissed." *Huber ex rel. Boothe v. Huber,* 204 S.W.3d 364, 368 (Mo.App. W.D.2006).

■ The only evidence that CAHSU requested a continuance is Mr. Champion's July 27 email in which he stated "I also informed the Court that Plaintiff requested that the trial be continued for 90 days and that Defendant's counsel did not oppose the continuance." This court is not provided a docket sheet to verify that CAHSU requested a continuance or that the trial court denied a request to extend the trial date. Nor has CAHSU provided this court with a transcript of the hearing in which CAHSU orally requested the continuance.

Further, the record does not indicate that Mr. Norouzian's trial counsel agreed that CAHSU's counsel could orally request a continuance. Rule 65.03 states that "An application for a continuance shall be made by a *written motion* accompanied by the affidavit of the applicant or some other credible person setting forth the facts upon which the application is based, *unless the adverse party consents that the application for continuance may be made orally.*" (Emphasis added.) Evidence that Mr. Norouzian's attorney agreed that CAHSU could make its request orally is essential because a trial court cannot abuse its discretion in denying a continuance when the party seeking the continuance has failed to comply with the requirements of Rule 65.03. *Mills v. Mills*, 939 S.W.2d 72, 74 (Mo.App. W.D.1997). The record on appeal, therefore, lacks information that is necessary for this court to decide whether the trial court abused its discretion by denying CAHSU's motion to continue the trial date. *Id.* Accordingly, CAHSU's eighth point is denied.

### Error in Judgment on 42 U.S.C. section 1981 Counterclaim

In its second point, CAHSU states:

THE CIRCUIT COURT ERRED IN ENTERING JUDGMENT FOR NOROUZIAN ON HIS 42 U.S.C. SECTION 1981 COUNTERCLAIM (COUNT IV), BECAUSE THE COURT MISAPPLIED THE LAW, IN THAT 42 U.S.C. SECTION 1981 DOES NOT PROVIDE A CAUSE OF ACTION FOR DISCRIMINATION ON THE BASIS OF RELIGION.

Mr. Norouzian argues that the point should be dismissed because the wording of CAHSU's point fails to "explain in a summary fashion why, in the context of this case, those legal reasons support the claim of reversible error" as required by Rule 84.04(d)(1)(C).

Technically, CAHSU's second point is deficient because it fails to explain why the statement of law supports the claim of reversible error in the context of this case. *Schroff v. Smart*, 120 S.W.3d 751, 757 (Mo.App. W.D.2003). Despite this deficiency, CAHSU clearly seeks to challenge the trial court's application of 42 U.S.C. section 1981 to Mr. Norouzian's counterclaim because Mr. Norouzian alleged only that he was discriminated on the basis of his religion, and 42 U.S.C. section 1981 does not provide a cause of action for religious discrimination. Further, Mr. Norouzian understood and addressed the claim of error raised by CAHSU. Because the technical deficiency does not impede disposition on the merits, this court will not exercise its discretion to dismiss the appeal. *Geiersbach v. Blue Cross/Blue Shield of Kansas City*, 58 S.W.3d 636, 639 (Mo.App. W.D.2001).

As CAHSU's second and third points are interrelated, this court will address the two points together. In its third point, CAHSU claims that the trial court erred in entering judgment for Mr. Norouzian on his 42 U.S.C. section 1981 counterclaim because the judgment is not based on substantial evidence of racial discrimination.

The trial court's judgment in a court-tried case will be affirmed by the appellate court unless the judgment is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). "The evidence, and permissible inferences therefrom, are viewed in the light most favorable to the judgment disregarding all contrary evidence and inferences." *Burkholder ex rel. Burkholder v. Burkholder*, 48 S.W.3d 596, 597–98 (Mo. banc 2001).

The language of 42 U.S.C. section 1981(a) (2000) states:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Though parties have attempted to bring claims of religious, sexual, and national origin discrimination under 42 U.S.C. section 1981, the statute does not pertain to those grounds. *Olson v. Rembrandt Printing Co.*, 375 F.Supp. 413, 417 (E.D.Mo.1974). The statute only "prohibits intentional *race* discrimination in the making and enforcing of contracts." *Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir.2006) (emphasis added). Courts have consistently held that 42 U.S.C. section 1981 "is by its very terms limited to acts of racial discrimination." *Brady v. Bristol–Meyers, Inc.*, 459 F.2d 621, 623 (8th Cir.1972). CAHSU claims that Mr. Norouzian's counterclaim failed to allege race discrimination.

Missouri is a fact-pleading state. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 379 (Mo. banc 1993). Rule 55.05 states that a pleading's allegations shall contain "a short and plain statement of the facts showing that the pleader is entitled to relief." Fact-pleadings "limit and define the issues of the case." *Luethans v. Wash. Univ.*, 894 S.W.2d 169, 172 (Mo. banc 1995).

The pleadings in Mr. Norouzian's counterclaim set forth facts to establish a claim for religious discrimination. Mr. Norouzian's pleadings do not allege race discrimination. First, the pleadings allege that "Dr. Modavi is an Iranian–American that practices the Christian religion" and "Mr. Norouzian is an Iranian–American that practices the Muslim religion." Second, the counterclaim alleges that Dr. Modavi told Mr. Norouzian that " 'Iranian Shiite Muslim mistreat Christian and Jews in Iran and Shiite Muslim deserve to be mistreated any where' " and then asked him if he had a Turkish background. Third, the counterclaim alleges that Dr. Modavi's refusal to give Mr. Norouzian the $2000 tuition reduction and to talk to him about it afterward "was the result of an illegal act of discrimination based on religion and in violation of 42 U.S.C. section 1981." Nowhere in the pleadings is the term "race discrimination" used, nor do the pleadings suggest that Dr. Modavi held discriminatory beliefs against some branch of Iranian ethnicity.

In his pleadings, Mr. Norouzian alleges that he is Iranian. A discrimination claim based solely on the fact that an individual is Iranian, however, is a claim based upon national origin, not race and, therefore, is insufficient to state a claim under 42 U.S.C. section 1981. *Zar v. S.D. Bd. of Exam'rs of Psychologists*, 976 F.2d 459, 467 (8th Cir.1992). Similarly, the pleadings allege that Mr. Norouzian practices "the Muslim religion" and that Dr. Modavi believes that "Shiite Muslim deserve to be mistreated any where." Because 42 U.S.C. section 1981 does not pertain to discrimination on the grounds of religion, Mr. Norouzian failed to state a claim for which relief under that statute could be granted. *Olson*, 375 F.Supp. at 417.

Despite Mr. Norouzian's failure to plead facts that would entitle him to a claim for relief under 42 U.S.C. section 1981, CAHSU never challenged the pleadings. Thus, Mr. Norouzian was given the opportunity to produce evidence at trial to support a

racial discrimination claim under 42 U.S.C. section 1981.

The only evidence of discrimination presented at trial was Mr. Norouzian's testimony:

Q. Let's move on to the discrimination claim. Are you claiming that you were discriminated by Mr.—Dr. Modavi?

A. Absolutely yes, because in his office, because we are both from the same country, Iran (indiscernible), which is located in Middle East in the border of Iraq and Afghanistan. And once when I was there, he said that you shame Muslim, discriminating and giving hard time and giving other bad behavior toward Christians. And because he was Christians, he had some comment that because you people mistreating Christians and Jews and other religion, you should be mistreated the same as other that have been mistreated.

And his comment was against me. And of course, I explained to Dr. Modavi that I came to this country in 1977. Revolution began 1979. I have nothing to do with all of those problem.

And of course, there was another doctor, Dr. Amami (phonetic spelling), who he was Christian—I mean, Shia Muslim that after a while I did not see him.

Q. Do you believe that his acts and the way he treated you in this situation, as far as not giving you the $2,000 reimbursement, as far as giving you kind of the runaround, as you have

described it, is because of his discrimination?

A. Yes. Yes, absolutely, I can believe that.

The United States Supreme Court has interpreted "racial discrimination" under 42 U.S.C. section 1981 to mean "discrimination [of] identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *Saint Francis Coll. v. Al–Khazraji*, 481 U.S. 604, 613, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987). In his brief to this court, Mr. Norouzian cites a passage from the same opinion: "If respondent ... can prove that he was subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the place or nation of his origin, or his religion, he will have made out a case under section 1981." *Id.* This passage is particularly relevant to this case because Mr. Norouzian failed to prove that he was subjected to discrimination based on his belonging to a certain race. Instead, Mr. Norouzian only offered evidence to prove discrimination based on his country of origin, Iran, and his religion, Islam. In fact, the record does not contain any indication of what Mr. Norouzian's race actually is. Mr. Norouzian testified that both he and Dr. Modavi were "from the same country, Iran," but he never presented evidence that he was of Persian ancestry or any of Iran's many other ethnicity as required for a claim under 42 U.S.C. section 1981. *Zar*, 976 F.2d at 467. Only in his brief to this court did Mr. Norouzian state, for the first time, that he is Arab.[10]

---

10. In his brief to this court, Mr. Norouzian wrote, "[t]he trial court correctly applied 42 U.S.C. section 1981 in that section 1981 supports an action for discrimination based upon ethnicity (*specifically being Arab*) and sup-ports an action between two people of the same race." (Emphasis added.) Prior to this appeal, Mr. Norouzian never alleged or presented any evidence that he and Dr. Modavi are Arab, a small minority in Iran.

In sum, because Mr. Norouzian failed to state a claim for which relief could be granted, under 42 U.S.C. section 1981, and failed to present sufficient evidence to support a finding of race-based discrimination, the trial court erred in entering judgment in Mr. Norouzian's favor. Accordingly, the judgment of the trial court finding in favor of Mr. Norouzian on his counterclaim for violation of 42 U.S.C. section 1981 is reversed.

### No Error in Judgment on Breach of Contract Counterclaim

In its fourth point, CAHSU claims that the trial court erred in entering judgment for Mr. Norouzian on his breach of contract, promissory estoppel, and unjust enrichment counterclaims because the judgment is not based on substantial evidence. Specifically, CAHSU claims that Mr. Norouzian failed to present evidence demonstrating that CAHSU agreed to reduce Mr. Norouzian's tuition beyond the first trimester.

The trial court's judgment in a court-tried case will be affirmed by the appellate court unless the judgment is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law. *Murphy*, 536 S.W.2d at 32. This court must view the evidence, and permissible inferences therefrom, in the light most favorable to Mr. Norouzian and disregard all contrary evidence and inferences. *Burkholder*, 48 S.W.3d at 597–98.

CAHSU claims that Mr. Norouzian failed to submit evidence that it agreed to reduce his tuition from $5500 to $3500 beyond Mr. Norouzian's first trimester at CAHSU. The record, however, shows that Mr. Norouzian did offer such evidence. At trial, Mr. Norouzian testified:

Q. Did you reach an agreement with Central America Health Sciences University for—where you would pay them a certain sum per trimester for classes and clinicals and if you passed all the classes and performed all the necessary medical clinicals, you would be granted a diploma?

A. Yes.

Q. Was that a valid agreement?

A. Yes.

Q. What was the total that you were to pay for *every trimester* or *every 16 weeks?*

A. $3,500 per 16 weeks.

(Emphasis added.) Mr. Norouzian clearly testified that the agreement between he and CAHSU was that he pay $3500 tuition per trimester, every trimester of medical school.

CAHSU claims that the actual agreement between the parties is the acceptance letter sent to Mr. Norouzian, which Mr. Norouzian signed on August 21, 1998, and states that his tuition fee is $5500 per trimester. Mr. Norouzian testified that he signed the acceptance letter but that he went to Dr. Modavi to "ask him about the extra $2,000." [11] Mr. Norouzian testified that, at that time, Dr. Modavi gave a handwritten document to Mr. Norouzian as a written manifestation of the oral contract between he and CAHSU. The document contains Mr. Norouzian's name, Dr. Modavi's signature, and the date of September 19, 1998. Mr. Norouzian testified that the numbers on this document reflect that his tuition was to be $3500 per 16 weeks.

11. In the record, it is unclear exactly which "extra $2,000" Mr. Norouzian went to ask Dr. Modavi about. The tuition of $5500 per trimester was $2000 above the agreed amount between Mr. Norouzian and CAHSU. The acceptance letter, however, included a $2000 "matriculation fee."

CAHSU contends that this document still does not prove that CAHSU agreed to give Mr. Norouzian a tuition rate of $3500 per trimester past the first trimester, and that the only proof of the discounted tuition rate extending beyond the first trimester is Mr. Norouzian's testimony.

■ "In order to make a submissible case of breach of contract, the complaining party must establish the existence of a valid contract, the rights of plaintiff and obligations of defendant under the contract, a breach by defendant, and damages resulting from the breach." *Wasson v. Schubert*, 964 S.W.2d 520, 524 (Mo.App. W.D.1998). At trial, Mr. Norouzian testified that: (1) a valid contract existed between himself and CAHSU; (2) the contract called for Mr. Norouzian to pay CAHSU $3500 in tuition per trimester in return for a medical education, and if Mr. Norouzian passed all the classes and performed all the clinicals, CAHSU would grant him a diploma; (3) by February 1, 2003, he had paid all the tuition, including $7562.50 overpayment, completed all the classwork, and performed all the clinicals, yet CAHSU would not give him his medical diploma; and (4) CAHSU owed him $7562.50 and CAHSU's failure to give Mr. Norouzian his diploma has put his medical career on hold, causing him significant loss.

That Mr. Norouzian relied on a single witness's testimony to support his theory of breach of contract is immaterial; "if the testimony of [Mr. Norouzian's] single witness is substantial evidence it will suffice to support [his] verdict." *Gaddy v. Skelly Oil Co.*, 364 Mo. 143, 259 S.W.2d 844, 848 (1953). In this court-tried case, the credibility of Mr. Norouzian and the weight given to his testimony were matters for the trial court. *Evans v. Werle*, 31 S.W.3d 489, 491 (Mo.App. W.D.2000). Therefore, reviewing the evidence in the light most favorable to the trial court's judgment, this court concludes that the trial court did not err in entering judgment for Mr. Norouzian because Mr. Norouzian presented evidence demonstrating that CAHSU agreed to a tuition rate of $3500 per trimester of Mr. Norouzian's medical school.

CAHSU's claims of insufficient evidence for promissory estoppel and unjust enrichment are also based on "[Mr.] Norouzian['s] fail[ure] to present evidence demonstrating that CAHSU agreed to reduce [Mr.] Norouzian's tuition beyond the first trimester." Therefore, having found that the trial court did not err in finding that Mr. Norouzian presented sufficient evidence showing that CAHSU agreed to reduce Mr. Norouzian's tuition beyond the first trimester, this court further finds that the trial court did not err in finding sufficient evidence to support Mr. Norouzian's promissory estoppel and unjust enrichment counterclaims. CAHSU's fourth point is denied.

### Partial Error in Award for Actual Damages

In its fifth point, CAHSU claims that the trial court erred in awarding Mr. Norouzian $400,000 in actual damages on his counterclaim because the damages were not based on substantial evidence. In particular, CAHSU claims that Mr. Norouzian failed to present reasonably certain, non-speculative evidence of his actual damages.

■ "As a general rule, in a breach of contract case, the goal in awarding damages is to put the non-breaching party in as good a position as he or she would have been in if the contract had been performed." *Cornejo v. Crawford County*, 153 S.W.3d 898, 902 (Mo.App. S.D.2005). "[A] party claiming damages for breach of contract bears 'the burden of proving the existence and amount of damages with reasonable certainty.'" *Delgado v. Mitchell*,

55 S.W.3d 508, 512 (Mo.App. S.D.2001) (citation omitted). " '[P]roof of actual facts which present a basis for a rational estimate of damages without resorting to speculation is required.' " *Id.* (citation omitted). "An appellate court will reverse a judgment that awards damages for breach of contract *if* the record shows an absence of proof of actual facts that present a basis for a rational estimate of damages without resort to speculation." *Id.*

▆▆▆ In this case, the sole evidence of Mr. Norouzian's damages on his claim for breach of contract is Mr. Norouzian's testimony. At trial, Mr. Norouzian testified that he overpaid CAHSU by $7562.50, and that amount was owed to him. He further testified that CAHSU's failure to give him his diploma delayed the start of his career as a medical doctor by three years because he was unable to sit for his medical boards, and the delay caused him $300,000–$400,000 in damages. Specifically, Mr. Norouzian testified that: (1) in residency, the average salary is "40 to 42," depending on the state; (2) he would be able to "moonlight" and receive "40 to $50,000 on top of whatever residents can earn"; (3) general practioners make an average salary of $150,000; and (4) he currently earns $25,000 annually.

The trial court entered judgment for Mr. Norouzian on all his counterclaims in the amount of $400,000 for actual damages. In his counterclaims, Mr. Norouzian sought actual damages for both lost salary and for $7562.50 in tuition overcharges. Therefore, this court presumes that the trial court awarded Mr. Norouzian $392,437.50 for lost salary and $7562.50 for overpayment. This court will address the two amounts separately.

First, CAHSU contends that Mr. Norouzian's testimony regarding his lost salary is completely speculative in that Mr. Norouzian failed to present evidence that, if he were given his diploma on time, he would have passed the medical boards, been hired by a hospital as a resident, been hired for "moonlighting," and been hired as a medical doctor. This court agrees.

Two prior appellate cases are on point. *See Total Econ. Athletic Mgmt. of America, Inc. v. Pickens,* 898 S.W.2d 98 (Mo. App. W.D.1995) and *City of St. Louis v. Riverside Waste Mgmt., L.L.C.,* 73 S.W.3d 794 (Mo.App. E.D.2002). In *Pickens,* Mr. Pickens, a football player at the University of Nebraska, signed a contract with a sports agent to negotiate his professional football contracts in return for a percentage of Mr. Pickens' compensation. 898 S.W.2d at 101–02. Before entering the professional league, Mr. Pickens hired a new agent and fired his original agent. *Id.* at 102–03. The new agent negotiated five one-year contracts with the Atlanta Falcons, and each contract required Mr. Pickens to make that year's team in order to receive the scheduled compensation. *Id.* at 103. The original agent sought to recover his portion of Mr. Pickens' compensation, and the case went to trial in the third year. *Id.* at 106–07. The original agent claimed he was entitled to a percentage of Mr. Pickens' scheduled compensation in years four and five, based on evidence that Mr. Pickens had made the team in the previous years. *Id.* The trial court, however, disallowed any claim to compensation in the fourth and fifth years because those claims were totally based on contingencies, i.e., Mr. Pickens making the team. *Id.* at 107. In affirming the trial court's judgment, this court found that "[b]ecause no evidence established with reasonable certainty that Mr. Pickens would qualify and become a member of the Atlanta Falcons Football Team in 1994 and 1995, his fulfillment of the contracts for those years was uncertain and speculative." *Id.*

In *Riverside Waste Mgmt.*, the public owner of a landfill and the city filed an action seeking to enjoin the landfill operator, which had a contract with the owner to run the landfill, from engaging in further activities at the landfill. 73 S.W.3d at 802. The operator filed a counterclaim seeking damages for breach of contract in the form of lost profits. *Id.* at 803. The operator's claim to recover future profits, however, required proof of the landfill's continued operation, which was contingent on a regulatory agency approving a necessary expansion of the landfill. *Id.* The evidence presented at trial revealed that there was no assurance that the request to expand the capacity of the landfill would be granted. *Id.* at 805. In reversing the trial court's damage award, the Eastern District of this court found that "Riverside failed to establish with reasonable certainty the occurrence of the essential future contingency that [the regulatory body] would grant a vertical expansion of the Landfill . . . Absent such evidence, Riverside's ability to continue operating the Landfill was uncertain and speculative, thus precluding an award. . . ." *Id.* at 806.

In this case, Mr. Norouzian claimed that CAHSU's withholding his diploma prohibited him from taking the exams necessary to become a resident in a hospital, and precluded him from becoming a doctor. "Although damages need not be absolutely certain, the existence and amount of damages must be reasonably certain and not speculative." *Pickens*, 898 S.W.2d at 107. Here, Mr. Norouzian's receipt of a resident's and medical doctor's salary was contingent on his passing the necessary exams and being approved by the appropriate licensing body to practice medicine.[12] Mr. Norouzian did not offer any evidence to establish the occurrence of these contin-

gencies. What "a regulatory body with discretion to approve or disapprove an application might do under the circumstances presented [is] inherently speculative." *Riverside Waste Mgmt.*, 73 S.W.3d at 806. Further, even if the regulatory body did grant a license to Mr. Norouzian, he did not offer any evidence to establish the likelihood that he would be hired into the medical profession. Because no evidence established with reasonable certainty that Mr. Norouzian would pass his exams, be licensed as a physician, or be hired as a resident and then a doctor, his claim to damages was uncertain and speculative. *Pickens*, 898 S.W.2d at 107. Therefore, the trial court erred in awarding Mr. Norouzian actual damages in the amount of $392,437.50 for his anticipated salary as a resident and medical doctor.

CAHSU also claims that Mr. Norouzian failed to provide any foundation for his testimony in support of his assertion that he "overpaid [CAHSU] by $7,562.50." Mr. Norouzian testified at trial:

Q. In your petition, you claim that you actually overpaid [CAHSU] by $7,562.50; is that correct?

A. Exactly. That's correct.

Q. Is that because the finance company that you were taking the loan with was actually paying a little bit extra?

A. Yes.

Mr. Norouzian's testimony was admitted into evidence without objection. Trial courts have discretion to determine a witness's credibility and to weigh the evidence. *Evans*, 31 S.W.3d at 491. "The trial court is vested with the discretion to believe or disbelieve all, part, or none of any witness' testimony." *Foster*, 140

**12.** At trial, Mr. Norouzian testified that, before becoming a resident, he was required to

pass three licensing exams covering sixteen different subjects.

S.W.3d at 607. In court-tried cases where the trial court does not make specific findings of fact, on review "all facts are presumed found in accord with the judgment...." *Ludlow v. Ahrens*, 812 S.W.2d 245, 248 (Mo.App. W.D.1991). Deferring to the trial court's determination of Mr. Norouzian's credibility, this court concludes that the trial court's judgment to award him $7562.50 was supported by the evidence. CAHSU's fifth point is granted in part and denied in part.

### Error in Award for Punitive Damages

In its sixth and seventh points, CAHSU challenges the trial court's award of punitive damages. In its sixth point, CAHSU claims that the trial court erred in awarding Mr. Norouzian $2,000,000 in punitive damages on his counterclaim because the trial court misapplied the law, in that Missouri law does not allow punitive damages for breach of contract, promissory estoppel, or unjust enrichment, and 42 U.S.C. section 1981 cannot be the basis for punitive damages because Mr. Norouzian did not plead or prove any basis for a claim under that statute. In its seventh point, CAHSU asserts that the trial court's punitive damages award is not based on substantial evidence, in that Mr. Norouzian is not entitled to punitive damages and the award was excessive, unreasonable, and unsupported by the evidence.

In his reply brief to this court, Mr. Norouzian concedes that he is not entitled to recover punitive damages on his breach of contract, promissory estoppel, and unjust enrichment counterclaims. *See Dewey v. Am. Stair Glide Corp.*, 557 S.W.2d 643, 650 (Mo.App.1977). Thus, Mr. Norouzian agrees that the punitive damages amount is founded solely on his 42 U.S.C. section 1981 claim.

Because Mr. Norouzian failed to state a claim for race-based discrimination under 42 U.S.C. section 1981, however, the trial court erred in awarding Mr. Norouzian punitive damages on that basis. Accordingly, the trial court's award of punitive damages in the amount of $2,000,000 is reversed.

### Conclusion

In conclusion, the trial court erred in entering judgment for Mr. Norouzian on his counterclaim for discrimination under 42 U.S.C. section 1981, awarding Mr. Norouzian actual damages for his anticipated salary as a resident and medical doctor in the amount of $392,437.50, and awarding Mr. Norouzian $2,000,000 in punitive damages. This court finds no reversible error in the trial court's denial of CAHSU's motion for a new trial under Rule 75.01, the denial of CAHSU's request to continue the trial date, the judgment for Mr. Norouzian on his breach of contract counterclaim, and the award of $7562.50 in actual damages.

All concur.